## Louisville & Nashville Railroad Co. v. City of Louisville.

(Decided April 20, 1911.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

Railroads—Work and Repair Shops—Exemption from Taxation—Re moval of Shops—Abandonment of Old Shops—Following its refusal to pay taxes for local purposes on its new work and ma chine shops on the ground that by an ordinance of appellee city they were exempt from taxation by the city for five years, this litigation between appellant and appellee arose. Appellant had long maintained its shops in Louisville, but abandoned them for want of sufficient ground, and disposing of its machinery, or the greater part of it, built new shops in another part of the city. Held, That the question is not analogous to the case known as the Mengel case for in that case the old company had gone out of business before the new corporation was formed. The new business in that instance was in reality as much a new business as if the old had never existed.

In this case the appellee city has not acquired any new business in the sense of the exempting ordinance; it has merely the exchange or substitution of a new and enlarged shop. The statute evidently contemplated the bringing in to the city a business that had not, theretofore, existed, and that was not accomplished here.

The record showing that appellant definitely contemplated building its new shops and that plans were prepared years before the exempting ordinance was enacted, and that the business is but the substitution of an enlarged for an old shop, the claim of exemption can not be sustained

HENRY L. STONE and T. K. HELM for appellant.

CLAYTON B. BLAKEY and LEON P. LEWIS for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Finding its work and repair shops in Louisville inadequate, the Louisville & Nashville R. R. Co. bought a tract of land in South Louisville, erected new buildings thereon, equipped them with the necessary machinery, and

abandoned its old shops. Conceiving that its new shops were exempt from taxation for local purposes for five years, it refused to pay same, and this litigation is the outgrowth of such refusal. The case was tried out before Hon. Shackelford Miller, Judge of the Jefferson Circuit Court, First Chancery Division. The facts are accurately stated by him and the conclusion reached so perfectly in accord with our views that his opinion is adopted as the opinion of this court. It is, as follows:

"To this action by the City of Louisville to recover City taxes regularly assessed against the new shops of the defendant Railroad Company for the years 1905 and 1906, there is interposed the single defense of exemption. Sec. 170 of the Constitution reads as follows:

" 'The General Assembly may authorize any incorporated city or town to exempt manufacturing establishments from municipal taxation, for a period not exceeding five years, as an inducement to their location.'

"The act of 1898 amending the charter of cities of the first class, and passed pursuant to the constitutional authority above quoted, provides as follows:

" 'The General Council shall have power by ordinance to exempt from municipal taxation, for a period not exceeding five years, manufacturing establishments, as an inducement to their location, within the city limits.'

"(Ky. Sts. Sec. 2980 A.)

"Acting under this authority, the General Council of the City of Louisville, in 1898, adopted an ordinance, the essential portion thereof reading as follows:

" 'That in order to induce the location of more manufacturing establishments within the city limits, any such establishments, owned and operated by any person, firm, or corporation, which shall have been, after the passage of the act authorizing this ordinance, permanently located and conducted within the limits of the City of Louisville, shall be and the same is hereby exempted for a period of five years after such location and the commencement of the business of manufacturing thereat, from all taxation whatever by the City of Louisville, on all property, real or personal, tangible or intangible, owned, employed and used by such person, firm or corporation, in conducting the business of such manufacturing establishment, and which would otherwise be subject to city taxation.'

"For many years prior to 1905 the defendant company had maintained its principal repair and construc-

tion shops at Tenth and Maple Streets in Louisville, in
which it employed more than 1400 men. As early as
1881 the defendant began to acquire land in South Louis-
ville, some three miles distant from the old shops, for the
purpose of ultimately building new shops thereon. In
1902 it had acquired and then owned 131 acres at that
point, for which it had paid $117,555.20, exclusive of
$155,514.46 which it had expended in constructing inter-
change and terminal yards, roundhouse, coal bins, sta-
tion, offices, etc., upon said land. As early as 1886 steps
were taken by the officers of the defendant, and plans
were then made for new shops to be erected upon the new
site in South Louisville. Finding that the ground then
owned by the company in South Louisville was insuffi-
cient for the purpose, the defendant subsequently bought
sixty acres of land between 1890 and 1901. From time to
time, from 1880 to 1902, as appears from the President's
letter of August 11, 1902, to the chairman of defendant's
board of directors, more or less consideration had been
given to the perfection of plans for the new shops. And
in February, 1902, the general manager of defendant, as
told in President Smith's letter, caused the 'work of pre-
paring and perfecting plans to be seriously entered upon
with the view of constructing the shops at an early date.'
The completed plans showed the estimated cost of the new
shops to be $2,114,694.00; and by a resolution of the de-
fendant's board of directors, adopted on August 1, 1902,
the President of defendant company was authorized to
proceed with the construction of the new shops at South
Louisville in accordance with the plans and estimate
above referred to, which had been submitted to and ap-
proved by the board of directors. The President prompt-
ly carried out the instructions of his board, and the new
shops were occupied about June, 1905. The old shops at
Tenth and Maple streets were abandoned, and practically
all of the old machinery was disposed of as scrap iron.
Only a small part of the best of the old machinery was
removed to the new shops where it was used in inferior
work. The new shops were of the latest and most im-
proved model, and are operated by electric power, and
because of that fact,—the character of the old shops,—
it was impossible to use any substantial part of the old
machinery in the new shops. It also became necessary
to employ about 150 mechanics from other cities to oper-
ate the new machinery, although the defendant com-
tinued in its service all of its old mechanics who desired

to continue, and who could adapt themselves to the new conditions. The number of men employed in the new shops has varied from 2100 to 3100; and, with one exception, the character of the work done in the new shops, does not differ materially from that done in the old shops; the new shops build locomotives while the old shop had abandoned that work many years ago. Both shops built freight and passenger cars; did brass work and flaging; made castings and frogings; prepared woodwork for use in repairing and building cars; and both had boiler shops, machine shops, pattern shops, and foundaries.

"As is aptly stated by one of the officers of the defendant company, 'the difference is altogether one of convenience and capacity.' The new shops do more work and better work and at a lower cost, but the character of the work of the new shops is substantially the same as that turned out by the old shops. The one is a mere enlargement and improvement over the other. Do these facts warrant the exemption of the new shops from taxation under the Constitution, statute, and ordinance above quoted?

"It should be borne in mind, that inasmuch as the Constitution requires a uniformity of taxation upon all property, exemptions from taxation are, like other cases of special privileges, to be strictly construed. Trustees of M. E. Church v. Ellis, 38 Ind. 3; State v. Mills, 34 N. J. 177; Nashville R. R. Co. v. Hodges, 7 Lea, 663; Railway Co. v. Philadelphia, 101 U. S. 528; and cases cited in Cooley's 'Constitutional Limitations', 7th ed. p. 396. Note 2 German Bank v. City of Louisville, 108 Ky. 383.

"The question has been considered by the Court of Appeals in the two cases of the Mengel Box Company v. City of Louisville, 117 Ky. 735, and the Continental Tobacco Co. v. City of Louisville, 128 Ky. 173.

"In the Mengel case the court sustained the exemption upon the sole ground that the old company had gone out of business before the new corporation was formed (p. 744); and that the new business was in reality as much a new business, as if the old business had never existed. Under that finding of fact the case was properly decided. And, in so deciding it the court expressly negatived the idea that the new business was 'a mere expansion of the old business' —thereby holding, by implication, that if the new business was a mere expansion of the old business, the claim to exemption could not prevail. Moreover, considerable weight was given in that

case, to a favorable opinion which the City of Louisville had given upholding the exemption before the new enterprise had been organized. But in the Continental Tobacco Co. case, the Court not only explained the Mengel Box Co. case, so as to restrict its application, but denied an exemption very similar to the one claimed here.

"In the Tobacco Company's case the court said:

" 'It is insisted for appellant, that as it was a separate and distinct corporation from those which operated the manufacturing plants when it became the owner, and, as *new capital* was used in the business, and *some new machinery* added to the plants, and new brains, energy and industry brought to bear in the operation of the plants, it *brought to Louisville new manufacturing establishments* in contemplation of the ordinance, the act of the General Assembly and the Constitution of this State.' (p. 175.)

" 'The evidence in this case shows that probably the *capacities* of the new establishments have been *increased,* and that more men have been employed since the appellant acquired the property than were previously employed. This only amounts to *an enlargement of the old plant,* a mere addition to the capital of the going concern, and under the principles of the Mengel case that would not entitle it to exemption from taxation for five years. If the appellant is not required to pay taxes under the facts of this case, it is possible for manufacturing establishments which are not new enterprises, to escape taxation for an indefinite period. The object and purpose of the exemption of manufacturing establishments from the payment of taxes for a certain period was to induce the location of new establishments in various cities of the Commonwealth, to induce persons of capital and enterprise and business capacity to invest their money so as to build up the cities of the State.' (177.)

"The result of this case is, that the City of Louisville has not acquired any new business in the sense of the exempting ordinance; it has merely the exchange or substitution of a new and enlarged shop for an old shop. The statute evidently contemplates the bringing to the city of Louisville, a business that had not theretofore existed there * * * a "new enterprise," a "new manufacturing establishment," to use the language of the opinion in the Tobacco Company's case.

"It is, however, suggested, that when the defendant had finally decided to abandon its old shops and build

new ones, the cities of Nashville and Paris, Tennessee, and Bowling Green, Kentucky, offered bonuses in the shape of sites and exemption from taxation, as inducements to the location of the new shops in those places; and that the new shops might have been removed to one of those cities if the defendant had not thought it would get the exemption from taxation here claimed.  There are at least two answers to the suggestions,—one of fact and the other of law.

"In the first place, the evidence does not show that the defendant ever took any action upon any proposition from other cities or that it located its new shops in South Louisville upon the expectation that it would thereby get the exemption.  On the contrary the letter of the President dated August 11, 1902, to Chairman Belmont of the Board of Directors clearly shows that defendant definitely contemplated building its new shops in South Louisville as early as 1881, and that Mr. Wells under the President's direction, had prepared plans of the new shops upon the new site as early as 1886—more than thirteen years before the exempting ordinance of 1898 was enacted.

"That these steps were taken entirely independent of any proposition from other cities, is made plain by the President's letter of August 11, 1902, to the Chairman of the defendant's Board of Directors, above referred to and which reads as follows:

" 'August 11, 1902.
72240

'August Belmont, Esq.,
          Chairman.
Dear Sir:
The repair and construction shops for constructing and maintaining the equipment of the company at Louisville are annually designated as the principal shops, the number of men employed therein being greater than at any of the other shops of the company.  In January, 1902, the daily average number of men employed in the Louisville shops was 1465.

" 'The shops may be said to have been established before the company was in operation, as they were originally owned and designed by a manufacturing company. They are badly arranged, being bisected north and south, east and west by streets.  I enclose blue print showing their location.  As it has been the intention of the management for many years past to abandon them

and build elsewhere, the expenditures for maintaining them have been kept as low as possible, and practically no additions have been made thereto for many years. Some of the structures are in a dilapidated condition. The arrangement is such that it does not seem to be feasible to adopt labor saving devices, especially in the handling of material; hence the expense for labor in repairing and constructing cars and locomotives has been and must continue to be excessive so long as the shops are in use.

"'The railroad connecting the main line with the eastern divisions forms a junction about three miles from the station at Tenth and Broadway, a station designated as South Louisville.

"'In 1881-82 the Company purchased 63.21 acres of ground at South Louisville for the purpose of establishing yards and constructing new shops. Prior to that time 8.39 acres had been acquired. In the year 1886 Mr. Reuben Wells, then Second Assistant to President, by my direction, made plans for shops of a capacity and character that in his judgment the company required. He found that the ground owned was insufficient, and in the year 1890, 46.546 additional acres were purchased, of which 14.775 acres were sold on December 14, 1891. Subsequent thereto, additional ground was purchased, during the years 1899, 1900 and 1901, amounting to 28.241 acres, so that at this time the Company owns 131.612 acres of ground upon which it has established interchange and terminal yards, a roundhouse, bin for storage of coal, station, offices, etc. The cost to June 30, 1902, has been as follows:

Ground purchased prior to 1881 ..............$5,151.00
Ground purchased 1881-1882.................50,944.50
Ground purchased 1890 ..................... 28,528.22
Ground purchased 1899-1900-1901 ............27,931.54

     Total . ............................$117,555.26

Cost of constructing yard to date............ 64,317.81
Roundhouse, coal bin, station, offices, etc...... 92,196.65

     Total expenditures to June 30, 1902 .....$274,069.72

"'From time to time more or less consideration has been given to the perfection of plans for shops. In February last the General Manager was instructed to cause

the work of preparing and perfecting plans to be seriously entered upon, with a view of constructing shops at an early date. All of the Company's chief mechanics were consulted and asked to submit their plans, or criticise those prepared under the supervision of the Superintendent of Machinery, which were submitted to them. In addition, Mr. T. H. Curtis, Mechanical Engineer, prepared plans. These plans after having been completed and carefully discussed with the General Manager and his Assistants, were submitted to me. I in turn submitted them to Mr. Reuben Wells formerly Superintendent of Machinery, at one time General Manager, L. & N. R. R., and who for many years has been superintendent of the Rogers Locomotive Works and has had long experience as a master mechanic, and is possessed of unusual skill and sound judgment. He made a revised plan which, with other plans, were again submitted to Mr. T. H. Curtis, Mechanical Engineer. Mr. Curtis and Mr. J. Werness, Assistant Engineer and Architect, were instructed to examine a number of modern shops, or shops that have been built and perfected within the last few years. They visited the following:

Lake Shore & Michigan Southern.......Collingwood, O.
Pittsburg & Lake Erie.............McKees Rocks, Pa.
Philadelphia & Reading..................Reading, Pa.
Central Ry. of New Jersey........Elizabeth Port, N. J.
Pittsburg, Cincinnati, Chicago & St. Louis..Columbus, O.
Westinghouse Air Brake.............Wilmerding, Pa.
Westinghouse Electric Mfg. Co........E. Pittsburg, Pa.
General Electric Co...............Schenectady, N. Y.
Schenectady Locomotive Works.....Schenectady, N. Y.
Pittsburg Locomotive Works...........Allegheny, Pa.
Brooks Locomotive Works.............Dunkirk, N .Y.
Pressed Steel Car Co..............McKees Rocks, Pa.

" 'After their return, Messrs. Curtis and Werness were instructed to prepare detailed plans of buildings and of the machinery required, and make an estimate of the cost.

" 'Herewith find blue print plans of buildings; also estimate of Mr. Werness and Mr. Curtis as to cost of constructing buildings and installing plant, as follows:

Buildings, etc. ........................$1,637,194.00
Machinery, etc. ........................  477,500.00
                                        ─────────────
                                        $2,114,694.00

" 'The ground now occupied by shops will be of great value for terminal and traffic purposes.

" 'I recommend that the construction of shops in accordance with plans and specifications be authorized, and Unified Fours drawn for the amount, under sub-section "E" of Section 2, Article IV of the Unified Mortgage, June 2, 1890.

Yours truly,  ·<br>
M. H. SMITH,<br>
<em>President.'</em>

"It will thus be seen that the fixed intention to build the new shops at South Louisville had existed for many years prior to the passage of the exempting ordinance in 1898, and that the moving causes therefor were the necessity for improved methods which required, among other things, consolidating of the shops which were then cut through by streets; the necessity for more ground,and the junction at South Louisville, of the main line of the road with its eastern divisions. The exempting ordinance was not mentioned as an inducement to the location or otherwise.

"In the second place, as a question of law, no authority has been cited, and it is believed none can be found, sustaining the proposition, that one's idea of the meaning and effect of a law can enlarge his rights thereunder. The Mengel case was not decided by the Court of Appeals until March 1, 1904,—fully eighteen months after the defendant's Board of Directors had authorized the building of the new shops by its resolution of August 14, 1902. And that case had been decided by the Circuit Court adversely to the exemption claim, probably a year earlier. Applying the principles of the decisions of the Court of Appeals in the Mengel case and in the Tobacco Company case, to the facts of this case I do not see how the exemption here claimed can be sustained. It will be denied, and judgment may go in behalf of the city for the taxes claimed in the petition.

"SHACKELFORD MILLER, Judge."

To the same effect is the case of Jones Bros., Castleman & Blakemore v. City of Louisville, <em>et al.,</em> 142 Ky. 759.

Judgment affirmed.