SELTENREICH et al. v. TOWN OF
FAIRBANKS et al.

No. 6926.

United States District Court.
D. Alaska, Fourth Judicial Division.
Fairbanks.

March 4, 1952.

322

Robert A. Parrish and George B. McNabb, Jr., of Fairbanks, Alaska, for plaintiffs.

Julien A. Hurley and Mike Stepovich, Jr., of Fairbanks, Alaska, for defendant.

Maurice T. Johnson, of Fairbanks, Alaska, for intervenor.

PRATT, District Judge.

This cause came on for hearing on plaintiffs' motion filed herein on the 12th day of October, 1951, for a temporary injunction restraining the Town of Fairbanks, Alaska, from abandoning the business of conducting a municipal airport.

The plaintiffs allege that the land included within said municipal airport, which is generally known as "Weeks Field," had been dedicated to the use of the public as an airport and devoted to such use for many years, as shown by the exhibits.

The defendant and intervenor maintain that said airport has never been dedicated to a public use or devoted thereto; that the Federal Government has completed an international airport two miles from the Town of Fairbanks which is available to plaintiffs; that the town is losing money in operating said airport and can not afford to do so; that plaintiffs are indebted to defendant, for airport services, as follows, to wit:

| | |
|---|---|
| Northern Consolidated Airlines | $5,500 |
| Fairbanks Air Service | 565 |
| Alaska Flying School | 480 |
| Total | $6,545 |

The motion was argued and submitted upon plaintiffs' amended complaint, defendant's answer, intervenor's answer, and the affidavits of L. F. Joy, James C. Ryan, and E. A. Tonseth.

Briefs were submitted by counsel for all parties.

Wherever "exhibits" are herein mentioned, the reference will be to the exhibits attached to plaintiffs' amended complaint, unless the contrary is specifically stated; "SLA" will be used to designate the Session Laws of Alaska; the Town of Fairbanks, Alaska, will be referred to as the "town" or the "city"; "A.J." will mean American Jurisprudence; and "McQuillin" will mean McQuillin on Municipal Corporations, 3rd Edition.

## Sec. I.

### Dedication to Public Use

(a) The following quotations are from volume 11 of McQuillin:

"Accordingly a dedication of land is generally defined as its devotion to a public use by an unequivocal act of the owner of the fee, manifesting an intention that it shall be accepted and used presently or in the future. The intention of the owner to dedicate and acceptance thereof by the public are the essential elements of a complete dedication." § 33.02, pages 579–580.

"In other words, the mere fact that private property is used by the public is not necessarily inconsistent with the absence of an intent to dedicate it to the public * *. If the user by the public does not exclude the owner's private rights, such user will ordinarily be regarded as merely permissive." Pages 660–662.

"The intent of the dedicator is the foundation and life of all dedications, and the intent must be clearly and unequivocally manifested." Page 669, § 33.36.

"The burden of proof to establish a dedication is on the party asserting it. Dedication is not presumed nor does a presumption of an intent to dedicate arise unless it is clearly shown by the owner's acts and declarations, or by a line of conduct the only reasonable explanation of which is that a dedication was intended." Pages 671–672.

"It is variously stated that the evidence to establish a dedication must be clear and conclusive; must be clear and convincing; must be clear and unequivocal; must tend to substantiate a clear intention to dedicate, or must be strict, cogent and convincing." Page 674.

" * * * it is elementary that an acceptance, either by public user or formal act, is necessary * * *. Accordingly, the general rule is that to complete a common-law dedication, acceptance is required." Pages 682–685, § 33.43.

"The general rule is that proof of acceptance by the public must be unequivocal, clear and satisfactory, and inconsistent with any other construction." Pages 727 and 728, § 33.54.

The following quotations are from 16 A.J.:

"Dedication is the intentional appropriation of land by the owner to some public use." 16 A.J., page 348, § 2.

"In all cases, the burden of proof is on the party asserting a dedication." Page 417, § 75.

" * * * The essence of a dedication to public uses is that it shall be for the

use of the public at large *. * * and if from the nature of the user it must be confined to a few individuals, such as the use of land for piling wood, the idea of dedication is negatived * * * and a grant by the owner of a private right of way over his land to buyers of different parcels of the same to furnish them with convenient access to the street is no dedication to public use." Page 359, § 15.

"The intention of the owner to set apart lands or property for the use of the public is the foundation and life of every dedication. * * * This intention is essential whether an express or an implied dedication is relied on. * * * In order to constitute a dedication by parol, there must be some acts proved evincing a clear intention to dedicate the property to public use. In any case the intention must clearly appear, and the acts and declarations of the owner relied on to establish it must be convincing and unequivocal * * *. Likewise, the intention must be to make a perpetual dedication." Pages 361–362, § 17.

### Proprietary Use

(b) The following quotations are from 37 A.J.:

"Every municipal corporation has a twofold character, * * * one is political, governmental, legislative, or public, while the other is variously designated as private, proprietary, municipal, or ministerial * *. In its governmental or public character, the corporation is made, by the state, one of its instruments * * *. But in its proprietary or private character, the theory is that the powers are supposed not to be conferred primarily * * * from considerations connected with the government of the state at large, but for the private advantage of the compact community which is incorporated * * *; and as to such powers * * * the corporation is frequently regarded as having the rights and obligations of a private, rather than those of a public, corporation. * * * The distinction between acts in the performance of a governmental function and those in * * * a proprietary function is that in the case of the former, the municipal corporation is executing the legislative mandate with respect to a public duty generally, while in the other, it is exercising its private rights as a corporate body * * * even though the public may derive a common benefit therefrom. * * * All functions of a municipal corporation not governmental are said to be municipal." Page 727, § 114; City of Walla Walla v. Walla Walla Water Company, 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341; Linne v. Bredes, 43 Wash. 540, 86 P. 858, 6 L.R.A.,N.S., 707.

In Seafeldt v. Port of Astoria, 141 Or. 418, 16 P.2d 943, it is stated as set forth in the syllabus:

"Term 'governmental functions' should be limited to duties imposed by state on municipal corporation, which latter must perform at peril, and other functions of municipal corporation are strictly 'municipal.'

"Property held by municipal corporation in proprietary capacity ordinarily may be alienated without consent of Legislature."

In Arkansas Valley Compress & Warehouse Co. v. Morgan et al., 217 Ark. 161, 229 S.W.2d 133, at page 134 it is held as stated in the syllabus:

"A city entering into contracts involving, not government of its citizens, but only convenience, pleasure and profit of city and its people, acts in 'proprietary capacity'. * * *

"Powers granted municipality for private advantages must be regarded as exercised by municipality as private corporation, though public may also derive benefit therefrom. * * *

"A municipal corporation, in its purely business, as distinguished from governmental, relations, is governed by same rules and held to same standard of just dealing prescribed by law for private individuals or corporations and is clothed with same full measure of authority over its property."

In City of Hazard v. Duff, 287 Ky. 427, 154 S.W.2d 28, at page 29(8), it is stated: "* * * but the courts in general, and those of this state in particular, are committed to the rule that a municipality engaged in maintaining and operating a waterworks does so in the exercise of a pro-

prietary or private character as distinguished from a governmental character."

In Dix et al. v. Port of Port Orford et al., 131 Or. 157, 282 P. 109, at page 110(2–4), it is stated: "As a general rule, the power of a municipality to convey property is equal to its power to acquire it. At common law a municipal corporation, unless restrained by its charter, could dispose of property in the same manner as private individuals. 19 R.C.L. 772. In the instant case, we do not think that the property acquired through purchase was dedicated to a public use. True, it inured to the benefit of the public, but the port was engaged in this commercial enterprise for profit as a toll was charged any shipper who used the wharf or docking facilities. It was not open to indiscriminate use by the public. In the maintenance and operation of this property, the port was acting in a proprietary capacity. * * * It held title to property which had been acquired for strictly corporate uses. * * * It is not a case of holding title to property in trust where there has been a dedication to a public use. * * * In our opinion the lower court erred in concluding that the port was exercising a governmental function in the maintenance and operation of this dock and wharf."

"In operating a public utility in a private or proprietary capacity, the municipality possesses the same rights and powers with reference to its management and control that a private owner possesses." 12 McQuillin, page 682; Dolan v. Louisville Water Co., 295 Ky. 291, 174 S.W.2d 425.

Property which is not appropriated or devoted to a public use may be disposed of by a city without special statutory authority. Southeastern Greyhound Lines, Inc., v. City of Lexington, 299 Ky. 510, 186 S.W.2d 201, 203.

In the operation of a public utility, it is generally held that a municipal corporation acts in a proprietary, rather than a governmental, capacity. 37 A.J. p. 729; 12 McQuillin, 3rd Ed., p. 678; 18 McQuillin, p. 414, § 53.100.

"Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporations * * *." 37 A.J. page 734.

"The general rule * * * is that property held in a governmental capacity, i. e., for a public use, cannot be sold without legislative authority * * * but it is otherwise as to property held in a private capacity and not devoted to any special public use." 10 McQuillin, page 72; 12 McQuillin, page 678.

"* * * All property of the municipal corporation of a private nature may be sold." 10 McQuillin, page 74.

"All property held by the city in fee simple, without limitation or restriction as to its alienation, may be disposed of by the city at any time before it is dedicated to a public use. In other words, the city has the right to sell or dispose of property, real or personal, to which it has the absolute title * * * in substantially the same manner as an individual unless restrained by statute or charter * * *." 10 McQuillin, page 75.

"* * * Land bought for a public purpose, if not actually so used, cannot be said to be affected by a public trust, and hence may be sold." 10 McQuillin, page 76. Southeastern Greyhound Lines, Inc., v. Lexington, 299 Ky. 510, 186 S.W.2d 202; Kings County Insurance Co. v. Stevens, 101 N.Y. 411, 5 N.E. 353; People ex rel. Lehigh Valley R. Co. v. State Tax Commission, 206 App. 549, 202 N.Y.S. 310; City National Bank of Ft. Smith, Ark. v. Incorporated Town of Kiowa, Okl., 230 P. 894; Seafeldt v. Port of Astoria, 141 Or. 418, 16 P.2d 943, 945; Haesloop v. City Council of Charleston, 123 S.C. 272, 115 S.E. 596, 600; Williamsburg v. Lyell, 132 Va. 455, 112 S.E. 666, 668; Head-Lipscomb-McCormick Co. v. City of Bristol, 127 Va. 669, 105 S.E. 500; Konrad v. Rogers, 70 Wis. 492, 36 N.W. 261.

So where land is donated to a village without any restrictions it may sell such land. Jenkins v. Hanson, 101 Minn. 298, 112 N.W. 216.

"It frequently has been reiterated that a municipality functions in a corporate or proprietary capacity in the operation and maintenance of public utilities * * * consequently municipal ownership of public utilities * * * must of necessity carry with it the same duty, responsibility and liability on account of negligence * *." 18 McQuillin, page 414, § 53.100; 37 A.J. 729, N. 1.

## Sec. II

## What The Exhibits Show

(a) Exhibit A is a deed executed July 1, 1922, by George A. Parks as trustee for the townsite of Fairbanks, Alaska, party of the first part, in favor of the Town of Fairbanks, Alaska, Inc., party of the second part. The deed conveys Tracts G, H, I, and J of said Townsite but provides that the land conveyed is to be held in trust for *park and recreational purposes* and that if any portion of said land is used for other purposes the title thereto will revert to the grantor. The townsite trustee mentions section 11 of the Act of Congress approved March 3, 1891, 26 Stat. 1095–99, 48 U.S. C.A. § 355, and the regulations thereunder as his authority.

26 Stat. page 1099 states: "Sec. 11. That * * * lands in Alaska may be entered for town-site purposes * * * by such trustee * * * as may be named by the Secretary of the Interior for that purpose, such entries to be made under the provisions of section [2387 R.S. U.S.] * * [and] the Secretary of the Interior shall provide by regulation for the proper execution of the trust in favor of the inhabitants of the town site * * * according to the spirit and intent of said section * * *."

Sec. 2387, R.S.U.S., 43 U.S.C.A. § 718, provides: "Whenever any portion of the public lands have been or may be settled upon and occupied as a town site * * * it is lawful, in case such town be incorporated, for the corporate authorities thereof * * * to enter at the proper land office * * * the land so settled * * * in trust for the several use and benefit of the occupants thereof * * *; the execution of which trust * * * to be con-ducted under such regulations as may be prescribed by the legislative authority of the State or Territory in which the same may be situated."

The regulations of the Secretary of the Interior, pursuant to the laws above mentioned, appear in 45 Land Decisions of the Department of the Interior at page 242 and are as follows, with reference to the present inquiry: "The following regulations are prescribed in accordance with said act" (Sec. 11, Act of March 3, 1891 aforesaid):

"1. If the land is unsurveyed the occupants must, by application * * * obtain a survey of the exterior lines * *. There must be excluded from the tract to be surveyed and entered for the town site any lands set aside by the district court under section 31 of the act of June 6, 1900 (31 Stat. 321, 332), for use as jail and courthouse sites, also all lands needed for Government purposes or use, together with any existing valid claim initiated under Russian rule."

" * * * 3. The trustee will file his * * notice of intention to make proof * * * and proof must be made showing occupancy of the tract * * * and that the town site does not contain any land occupied by the United States for school or other purposes or land occupied under any existing valid claim initiated under Russian rule."

" * * * 6. Lands possessed by Indian or native Alaskan occupants shall not be assessed nor conveyed by the trustee."

" * * * 11. After deeds have been issued to the parties entitled thereto the trustee will publish notice that he will sell * * * all lots and tracts remaining unoccupied and unclaimed at the date of the trustee's entry * * *. The notice of public sale will be published * * * and copies thereof posted * * *. Each lot must be sold at a fair price * * *. Lots remaining unsold at the close of the public sale in an unincorporated town may again be offered at a fair price if a sufficient demand appears therefor."

"12. Immediately after the public sale the trustee will make * * * his final report * * *. If the town is incorpo-

rated such remaining proceeds may be turned over to the municipality for the use and benefit thereof. After the public sale and upon proof of the incorporation of the town, all lots then remaining unsold will be deeded to the municipality, and all municipal public reserves will, by a separate deed, be conveyed to the municipality in trust for the public purposes for which they were reserved."

Section 31 of the Act of June 6, 1900, above mentioned in paragraph 1 of the regulations aforesaid is found in 31 Stat. p. 332, 48 U.S.C.A. § 40. Its provisions as related to the present inquiry are as follows: "* * * any part or portion of the unappropriated public domain of the United States, embracing not more than four thousand square feet * * * may be set aside by order of the court as a jail site * * *, a certified copy of which order of the court shall be by the clerk thereof transmitted to the Commissioner of the General Land Office * * * and thereafter the ground described shall be reserved from sale or other disposition * * *."

Exhibit B is a copy of a deed issued by the Town of Fairbanks, Alaska, Inc., to the United States of America on January 11, 1950, quit-claiming as to said Tracts G, H, I, and J.

Exhibit C is a deed dated February 9, 1950, from the United States to present Trustee of the Town of Fairbanks, Alaska, Inc., conveying said tracts to the present townsite trustee of Fairbanks, Alaska, and reciting that the provision in the deed of Parks, trustee, requiring said tracts to be used for parks and recreational purposes was unauthorized under the regulations authorizing the issuance of the deed (Regulation July 19, 1916, 45 L.D., par. 12, page 244). Exhibit C does not contain any limitation on the use of said tracts.

Exhibit D is a deed of date February 9, 1950, between the present trustee for the townsite and the Town of Fairbanks, Alaska, Inc. It conveys said tracts to the Town of Fairbanks, Alaska, Inc., without any limitation as to their use.

In paragraph III of plaintiffs' amended complaint it is alleged that the defendant did acquire, in 1922, the property described in Exhibits A, B, C, and D, as more particularly shown on map Exhibit E.

Whether the Parks' deed (Exhibit A) was void or invalid, it could not operate as a dedication for an airport of the tracts of land therein mentioned, for the reason that it expressly limited the use of the said tracts for the purpose of parks and recreation. It made no attempt to operate as an express dedication for airport purposes. The Town of Fairbanks, no doubt believing that it was limited to the use of said tracts for parks and recreational purposes, never accepted said Parks' deed as any dedication for airport purposes or otherwise. Neither did the Town of Fairbanks ever accept the limitations of the Parks' deed for parks and recreation. The town did use said tracts for airport purposes but it was in a proprietary capacity. At all times the Town of Fairbanks specifically retained control of the airport and made rules requiring the doing of certain things by those using the airport, including the payment of rent for hangar and other facilities and the payment of landing fees, and so forth.

The Parks' deed was either void or voidable, as to the limitation of use for parks and recreational purposes. The Federal Government recognized that fact and made an exchange of deeds in 1950 whereby the United States through the present townsite trustee for Fairbanks deeded said tracts to the Town of Fairbanks without any limitation or restriction whatsoever as to the use said tracts were to be put. It was a clear and unequivocal act showing that there was no intention on the part of the Federal Government to limit the use of said tracts. In fact, there would have been no statutory authorization for the Federal Government to make a limitation on the use that said tracts were to be put. The City of Fairbanks, in 1950, became the owner in fee simple without limitation as to use of said tracts. Said deed of February 9, 1950, from the townsite trustee to the City of Fairbanks, Inc., gave the city the right to use said tracts without any restriction as to use.

It seems very clear, therefore, that the airport as constituted by the tracts

mentioned in paragraph III of said amended complaint has never been dedicated to the public use of an airport.

(b) In paragraph IV of plaintiffs' amended complaint it is alleged that the defendant acquired property from Paul and Stacia Rickert for airport purposes, according to Exhibits F, H, I, and J, as shown on Exhibit E, a map.

Exhibit F is a copy of a deed between Paul J. Rickert and Stacia T. Rickert, parties of the first part, and the Town of Fairbanks, Alaska, party of the second part. The deed sells, conveys, and confirms unto the party of the second part a tract of land of 5.28 acres.

Nowhere in the deed is there any limitation as to the use of the ground conveyed thereby. There is a paragraph of warranty on the part of the grantors and there is a statement that the deed is "for and in consideration of the sum of One Dollar, lawful money of the United States of America, and other good and valuable consideration, to them in hand paid by the party of the second part, the receipt of all of which is hereby acknowledged."

■ The deed (Exhibit G) did not contain any provision to the effect that the land therein mentioned should be used for any particular purpose, nor did it attempt to provide that a reversion should take place of the title if the land were used for any particular purpose. The deed was executed August 10, 1927. The minutes of the council meeting of the Town of Fairbanks on August 23, 1927, recite: "A deed from Stacia and Paul Rickert giving the city for airport purposes, 5.28 acres of land from their homestead was read and it was moved * * * that the gift be accepted. Carried." The deed does not limit the use of the land conveyed to any purpose and does not provide for a reverter in case the land is used for any unauthorized purpose. The deed is a fee simple deed and negatives that the Rickerts had any intention of limiting the use of the land. It certainly could not act as a dedication as none of the elements of a dedication exist in regard to this deed.

Exhibit H is a copy of a deed dated September 11, 1929, wherein Paul J. Rickert and Stacia T. Rickert, as parties of the first part, deed to the Territory of Alaska, as party of the second part, for and in consideration of the sum of One Dollar, "the receipt whereof is hereby acknowledged," a described piece of land alleged to contain 60.5 acres. There is no limitation whatsoever as to the use the Territory of Alaska is to put said land conveyed.

■ Exhibit I, while in the form of a deed, is merely a statement on the part of Paul and Stacia Rickert that their deed to the Territory of Alaska (Exhibit H) contains 62 acres instead of the recited 60.5 acres and that they wanted to give the excess over 60 acres to the Town of Fairbanks when a more correct description of said excess is ascertained. In said Exhibit I it is stated that Exhibit H was "intended to convey 60 acres of ground for airfield purposes * * *." There was no limitation in Exhibit H that the property was to be used for airfield purposes by the Territory of Alaska or anyone else. The deed, Exhibit H, describes the property conveyed by metes and bounds and ends the description by saying it contains 60.5 acres. Under the laws of Alaska, when a deed describes the land by metes and bounds and makes an erroneous statement as to the acreage involved, the deed conveys the land as described by metes and bounds and in disregard of the alleged acreage. 58-7-3 (1), Alaska Compiled Laws Annotated.

■ Inasmuch as the Territory of Alaska, by deed of June 23, 1945, Exhibit J, conveyed the identical land mentioned in Exhibits H and I to the Town of Fairbanks by means of a description identical with that of Exhibit H is immaterial, as the town got all of the tract alleged to contain 60.5 acres and also the two acres exceeding the 60.5 acres.

■ The fact that Paul and Stacia Rickert in their deed (Exhibit I) recite that their former deed (Exhibit H) to the Territory of Alaska was intended to convey ground for airfield purposes is insufficient to constitute proof of the making of a dedication of the property mentioned in Ex-

hibit H for the public use of said land as an airfield. The deed transferred a fee simple title without limitations and that would control over the surplus allegation by way of recital in Exhibit H.

Exhibit J is a copy of a deed of date June 23, 1945, wherein the Territory of Alaska deeded to the Town of Fairbanks, Alaska, the property described in Exhibit H by means of a description which is the same as that contained in Exhibit H. There is no mention of the last-mentioned deed of the land being used for any particular purpose.

Consequently it seems clear that the exhibits mentioned in said paragraph IV of plaintiffs' amended complaint (Exhibits F, H, I, and J) do not contain any dedication of any land for a public use and devoted thereto.

(c) In paragraph V of plaintiffs' amended complaint it is stated that Paul and Stacia Rickert did convey to the defendant (as shown by Exhibit G) 5.28 acres by gift for airfield purposes.

Exhibit G is a copy of the minutes of a regular meeting of the City Council of Fairbanks on August 23, 1927. It states among other things: "Mr. Thompson read a telegram from Gen. Steese to Hawley Sterling stating that $1,000.00 more would be necessary to complete the work on the airport, $500.00 from the City and $500.00 from the Territory. Moved by Kubon seconded by Kennedy that an additional $500.-00 be appropriated from City funds for this purpose. Carried. A deed from Stacia and Paul Rickert giving the City for airport purposes 5.28 Acres of land from their homestead was read, and it was moved by Kennedy seconded by Gilcher that the gift be accepted. Carried. * * *"

It is believed that the above minutes do not show that the city or the Territory actually paid the $500 authorized to be paid. Even if the Territory did actually pay the $500, the Territory of Alaska, and not the plaintiffs in this case, would be the party to complain about the abandonment of the airport. Further, the fact that when the Rickerts executed their deed in favor of the city for 5.28 acres, they made no such limitation. That negatives that they desired to limit the use of the land to the purposes of an airport. The deed is an absolute conveyance without any limitation of use. There is no provision for a reverter in case the property is used for purposes other than an airport.

It is believed the deeds of Mr. and Mrs. Rickert (Exhibit F conveying 5.28 acres to defendant and Exhibit H conveying 60.5 acres to the Territory) being without any limitation show the intention of the grantors and it controls over their recital in Exhibit I that they had intended, in executing said Exhibits F and H, to limit the use of said lands to airport purposes.

(d) In Paragraph VIII the plaintiffs allege that defendant did acquire for airport purposes 370 acres of real property as evidenced by Exhibits Q and R.

Exhibit Q is Resolution No. 21 of the Town Council of Fairbanks, Alaska, submitted and passed on the 9th day of January, 1950. The following portions only are pertinent to this inquiry:

"Resolution No. 21.

"Whereas, the City of Fairbanks did purchase approximately 370 acres of land, being portions of the Rickert and Day Homesteads, for airport purposes; and

"Whereas, the airport known as Weeks Field will be abandoned during the year 1950; and

"Whereas, the city proposes to subdivide the land purchased for airport purposes, together with Tracts 'G', 'H', 'I' and 'J' that was deeded to the City by Trustee Deed so as to encourage housing development in the City of Fairbanks; * * *.

"Now, Therefore, Be It Resolved * * that the Mayor be and he hereby is authorized to exchange deeds with the U. S. Government in order to obtain an unrestricted deed to Tracts 'G', 'H', 'I', and 'J'."

"The vote:

"Ayes: Anderson, Doogan, Fenton, Hoopes, and Van Scoy.

"Nay: None."

Exhibit R is practically the same as Exhibit Q except in that it authorizes an exchange of deeds with W. George Moore.

The plaintiffs seem to believe that if the Town of Fairbanks purchased any land with the intention of using it as an airport they were forthwith estopped from ever using it for anything else or abandoning the airport business altogether.

It is believed that this theory is incorrect.

(e) Exhibit N is an ordinance of the Town of Fairbanks, Alaska, passed upon the 21st day of July, 1931. It establishes "for the use of the City of Fairbanks, Alaska, its inhabitants, and of visiting aircraft * * * a municipal airport * *; that said airport shall be available for use by public, private and commercial aircraft." As much of the "Park Reserve" as may be necessary for use as a landing field is set aside but it is provided that nothing in that ordinance shall be construed to divest the Town of its title to the lands embraced within said "Park Reserve" nor to be construed as a surrender by the town of its right to regulate and manage the "Park Reserve" as a public park. An Airport Commission was provided for, with authority to promulgate rules and regulations, which shall be in effect until the same shall be altered, amended, or repealed by the Common Council. Any regulation so altered by the Common Council shall not be thereafter subject to any change by said Airport Commission.

A portion of the "Park Reserve" (which is in Tract J) was reserved for the purpose of leasing to those engaged in "commercial," public, or private operation of aircraft. The Mayor was given authority to lease portions of land in said airport. Subparagraph (b) of Section 6 of Exhibit N provides: "The rental charge for the leased area shall be Ten Dollars per fifty front feet paralleling any runway, or fraction thereof, per year, payable annually in advance."

Subparagraph (c) of said exhibit makes provision for the lessor terminating leases.

Subparagraph (e) of said Section 6 of said Exhibit N provides that buildings erected on leased land shall become the property of the city if not removed within 30 days after the termination of such lease.

■ From the above, it is clear that the Common Council of the Town of Fairbanks was creating, by said ordinance, an airport which was definitely the property of and under the control of the Town of Fairbanks. Its requirement of rental for using parts of the airport for buildings at a rental therein set forth negatives any intention on the part of the town to dedicate the land mentioned as "Park Reserve" to the public. The ordinance in effect required anyone who wanted to use the airport to attorn to the Town of Fairbanks, Alaska, as their landlord and pay rent and abide by the rules and regulations promulgated by the Airport Commission or the Common Council of the Town of Fairbanks, Alaska.

(f) Exhibit P is a copy of an Ordinance of the Town of Fairbanks, Alaska, of date August 4, 1940. It promulgates regulations. Section 1 provides that only aircraft and airmen licensed by the Civil Aeronautics Authority of the United States shall operate on or over the Fairbanks airport (except student fliers or public aircraft). Section 4 provides that persons using the airport for commercial aviation or other commercial or private purpose shall first secure a permit from the City Clerk and pay the fees and charges prescribed. Section 35 provides that anyone violating the provisions of the ordinance (Exhibit P) shall be subject to a fine and/or imprisonment and suspension from the use of the airport for not to exceed 30 days.

■ This ordinance again makes it clear that the Town of Fairbanks, Alaska, did not and had not relinquished ownership and control of said airport and the right to use the same as a source of income and to administer such use to the full extent of the powers given to it in regard to other property of the municipality.

■ (g) Exhibit O is a copy of a Resolution of the Common Council of the Town of Fairbanks, Alaska. Among its provisions are the following:

"Whereas, most of the owners of aircraft now using the municipal airport at Fairbanks, Alaska, commonly known as 'Weeks Field', have failed and refused to pay to the City of Fairbanks the money now due and owing from said owners to the City of Fairbanks for the use of said airport, and the City of Fairbanks is not financially able to continue the maintenance of said municipal airport or to employ the proper persons to manage and control the same, and,

"Whereas, a new airport, commonly known as the 'International Airport', has been constructed by the Federal Government approximately two miles from the City of Fairbanks and is now available for the public use and by all aircraft carrying freight and passengers to and from the City of Fairbanks and is a much larger, better constructed and safer airport than the 'Weeks Field' airport and is under the control of the Civil Aeronautics Administration and ample to serve all the needs of the City of Fairbanks and the general public for a public airport, and,

"Whereas, the said 'Weeks Field' airport is no longer being used, and has not been used since April 17, 1951, by airplanes of a gross weight of over 12,500 pounds, and is now being used by only a small number of one-engine airplanes, and,

"Whereas, new buildings, including residences and a new school building, have been built in close proximity to said 'Weeks Field' airport and as a result thereof the said 'Weeks Field' airport is no longer safe and the use thereof endangers not only the lives of those who use the airport but the lives of those living in the vicinity of said airport and the children who will attend said school, and

"Whereas, it is no longer necessary or convenient to longer continue the use of said 'Weeks Field' airport for the general welfare or benefit of the general public and the condition of said airport is unfit for the landing of aircraft, and,

"Whereas, the land embraced in said 'Weeks Field' is now needed for housing and recreational purposes and can no longer be safely used as an airport;

"Now, Therefore, It Is Hereby Ordered By and on behalf of the Common Council of the City of Fairbanks, Alaska, that the said municipal airport commonly known as 'Weeks Field' be, and the same is hereby, closed for use as an airport and the use of the same on and after the 15th day of October, 1951, either for the landing or the taking off of airplanes is hereby prohibited.

"Adopted This 17th day of September, 1951.

"Robert Hoopes
Mayor

(City Of Fairbanks Seal)
"Attest:
E. A. Tonseth
Municipal Clerk."

This furnishes cumulative evidence of the fact that the Town of Fairbanks did not intend to convey said tracts to the use of the public.

(h) Exhibit S is a copy of Ordinance No. 527 passed by the Common Council of the Town of Fairbanks, Alaska, upon the 17th day of September, 1951. It provides that it shall be unlawful for anyone to land an airplane or to take off with an airplane from the land known as Weeks Field after the 15th day of October, 1951.

(i) Paragraphs XV A and XV B of plaintiffs' amended complaint allege that Resolution No. 51 (Exhibit O) is in violation of the Constitution of the United States, in that it deprives the plaintiffs of property without due process of law. It is believed that the matters herein set forth show that no dedication was ever made for the Fairbanks airport; that all of the property of the city hereinbefore mentioned remain the private property of the city, not subject to any public trust, and that the city had full power to pass the ordinance, Exhibit O, under the provisions of Section 16-1-35, eleventh, A.C.L.A.1949, "to prohibit * * * conduct endangering the public peace, public health, [or] public safety." The town, being the owner of the property hereinbefore mentioned, had a right to prohibit the use of its property for landing and take-offs of airplanes inasmuch as that was greatly endangering the public safety.

As the mere intention to use said homesteads for airport purposes is a far cry from a dedication of the land to the public for airport purposes, it is believed that Exhibit Q in no way proves any of the issues of this case, even though it be considered that said town at one time intended to use said Day and Rickert homesteads for airport purposes.

The other recitals of the resolution show that notice was given on the 9th day of January, 1950, that Weeks Field would be abandoned during the year of 1950, thus giving ample opportunity to plaintiffs to avail themselves of the airport facilities of the International Airport or elsewhere.

Said Resolution No. 21 also authorizes an exchange of deeds with the United States in order to obtain an unrestricted deed to Tracts G, H, I and K as authorized by Chapter 7, S.L.A. 1931, 16-1-35, 20th Subdivision, page 196, A.C.L.A. '49. That such an exchange of deeds was advantageous to the town, in the judgment of the Common Council, appears by implication from the terms of the resolution.

Exhibit R is Resolution No. 22 of said Town Council. It is practically the same as Resolution No. 21, except that it authorizes an exchange of deeds with W. George Moore.

### Sec. III

### Denali Purchase

(a) In intervenor's first affirmative defense it is set forth that it "has acquired from the City of Fairbanks the following described property by deed made and executed on the 9th day of June, 1950, and recorded on the 21st day of June, 1950."

■ No answer or denial of any sort was filed by the plaintiffs to the intervenor's first affirmative defense. Consequently it is believed that the plaintiffs intended to and did admit the matters set forth in said first affirmative defense of intervenor.

That the deed was duly and legally authorized and executed by the Town of Fairbanks to the intervenor is necessarily admitted by failure to answer said first affirmative defense. Such admission is consistent with plaintiffs' map, Exhibit E, which shows the ground in controversy in this suit to be entirely within the boundaries of the Town of Fairbanks except on the south side. In other words, the Weeks Field shown by said map goes no farther west than to the westerly boundary of the town.

The plaintiffs' position depends entirely upon whether or not a dedication was made of the property constituting Weeks Field. Inasmuch as such a dedication is not sustained by the evidence in this case but is negatived it would be immaterial, as far as the plaintiffs are concerned, what the position of the intervenor is in regard to said Denali School premises.

■ The execution of the deed to the intervenor implies a finding on the part of the Common Council of Fairbanks, Alaska, that in its judgment the land deeded is no longer required for municipal purposes. Such a finding and such a deed were authorized by the first clause of Chapter 7 S.L.A. 1931, which became the first paragraph of Section 16-1-35, 20th Subdivision, ACLA 1949. No ratification of said sale of the Denali School lands and the execution of the deed is required by said first clause of Chapter 7, S.L.A. 1931, as to land which had not been acquired or held for any public use or devoted thereto, such as the land within the Denali School premises.

■ (b) If the Common Council of Fairbanks failed to make the finding mentioned in the first clause of said Chapter 7, S.L.A. 1931, that in their judgment the Denali premises were no longer required for municipal purposes or, as authorized by the second clause of said Chapter 7, that in their judgment it was advantageous to the city to donate said Denali premises to said school district, such failure on the part of the City Council would not inure to the benefit of the plaintiffs or assist them in making out any sort of a case for a preliminary injunction.

The above is stated with due consideration of the fact that said Chapter 7, S.L.A. 1931, and Chapter 27, S.L.A. 1945, constitute a part (along with a number of amendments) of Chapter 61, S.L.A. 1951,

which became effective 90 days after the passage thereof, which was upon the 22nd day of March, 1951.

(c) In paragraph IX of plaintiffs' amended complaint it is stated that Weeks Field, by dedication and user, has become public property, as evidenced by Exhibits G, N, O, P, Q, and R. It is believed that said exhibits last mentioned, as well as all other exhibits in the case, fail to show any dedication of said Weeks Field for a public purpose, but in fact definitely show that it was the intention of the owner thereof to make no such dedication.

While the intervenor and no doubt other persons (excluding the present plaintiffs) have a right to procure the findings of the City Council mentioned above relative to said Denali School premises, such right does not in any way assist the plaintiffs in making out their case.

## Sec. IV
### Intervenor's Exhibit B
### (Ballot Of Special Election Of February 21, 1950)

■ (a) The descriptions of land in Propositions Nos. 3, 4, 5, 6, 7, and 8 of said ballot (Exhibit B) are so vague and indefinite as not to give the voters a knowledge of the land referred to. Proposition No. 3 furnishes a good example. It asks the voter: "Shall the City of Fairbanks sell and convey to the Fairview Development Corporation a parcel of the land containing approximately 12 acres and located partially in the original townsite of Fairbanks and partially immediately south of the south boundary of the original plat of the townsite of Fairbanks * * *".

Propositions Nos. 3, 4, 5, 6, 7, and 8, therefore, are invalid and do not furnish a ratification by the voters of any ordinance or other sale of real estate as mentioned in the fourth clause of Chapter 7, S.L.A. 1931, Section 16–1–35, page 196, A.C.L.A. 1949. Such ratification is, however, not necessary under the first and second clauses of said Chapter 7 S.L.A. 1931.

■ Proposition No. 9 has a sufficient description of the land to be sold but is defective in the following particulars, to wit:

(1) That there is no showing that the Common Council of Fairbanks passed an ordinance setting forth the terms of the proposed sale and the consideration thereof;

(2) That said Common Council in their best judgment considered that said premises were no longer required for municipal purposes.

There having been no written grant to the public of the land involved in the municipal airport in this case, the only manner in which said lands could be held in trust for the public, in this case, would be if the facts complied with the common law as to what constitutes a dedication to the public use.

■ A common-law dedication, as mentioned before, requires a definite intention on the part of the grantor to dedicate designated land to the public use. There was certainly no such intention shown in this case.

■ A common-law dedication further requires that such an intention exists and be shown clearly and unequivocally. Certainly no such matter was shown in this case.

Most of Weeks Field lies within the boundaries of the original Town of Fairbanks, Alaska, in Tracts G, H, I, and J, which were tied up by a limitation for use only as a public park and for recreational purposes from 1912 until 1950. The Town of Fairbanks was very careful in all of its ordinances to show that it was reserving all rights with reference to said tracts. At no time before or after execution of the deed to said tracts without limitation as to the use thereof, did the Town of Fairbanks express any intention to dedicate said tracts to the general public.

(b) Necessity of Reverter Clause in Deed:

In Wright v. Morgan, 191 U.S. 55, 24 S.Ct. 6, 48 L.Ed. 89, it was held that where the statute provided that reservations may be made for parks and other public purposes in patents it probably meant no more than to explain the motive for a sale under the circumstances at the minimum price; that the deed was a conveyance of title

with no restrictions upon its use, nor right of re-entry for condition broken; that in view of the strong disinclination of the courts to annex conditions or restrictions in the absence of a clear expression of such intent, it would seem to be the duty of the Court to hold that no such condition or restriction in intended.

In Sharp v. City of Guthrie, Okl.Sup., 145 P. 764, 765, a patent contained the following: "to have and to hold and maintain the same for the sole and separate use, benefit and purpose of a public park for public uses and no other." On rehearing in 49 Okl. 213, 152 P. 403, the Court held that the City took a fee-simple title, free from any trust or condition, and with power of alienation.

In Ward v. Klamath County, 108 Or. 574, 218 P. 927, it was held that where the deed provided that a Court House should be built upon the land, but did not provide for a reverter, it gave an indefeasible title.

In 19 A.J., page 527, Sec. 65, it is stated: "It is a well-settled rule that conditions tending to destroy estates, such as conditions subsequent, are not favored in law. They are strictly construed. Accordingly, no provision will be interpreted to create such a condition if the language will bear any other reasonable interpretation, or unless the language, used unequivocally, indicates an intention upon the part of the grantor or devisor to that effect and plainly admits of such construction." To the same effect are the cases of Toole v. Christ Church, Tex.Civ.App., 141 S.W.2d 720; Watts et al. v. City of Houston, Tex.Civ. App., 196 S.W.2d 553; Board of Education of Borough of West Paterson v. Brophy, 90 N.J.Eq. 57, 106 A. 32; and Briggs v. City of Grand Rapids, 261 Mich. 11, 245 N.W. 555.

(c) In this case it is clear that there was, in the deeds given to the Town of Fairbanks, no limitation requiring the land to be used for an airfield. Likewise in said deeds there was no clause stating that if the land conveyed were used for any purpose other than airport purposes it would revert to the grantor.

Plaintiffs' rights cannot be based upon an express dedication, as none existed. Plaintiffs' rights could be perfected by a common-law dedication, but the evidence in this case fails to show any of the elements of a common-law dedication and, in fact, definitely shows the lack of such a dedication.

### Sec. V
### Housing Industry

Chapter 27, S.L.A. 1945, which constitutes the second paragraph in Section 16-1-35, page 197, A.C.L.A. 1949, provides: " * * * that the common council, in order to make available sites for the * * operation thereon of new industries which will benefit the civic welfare of the municipality * * * may sell, lease or dispose thereof upon such terms or conditions as may be deemed advantageous to the civic welfare of the municipality, to such persons * * * or corporations as will agree to install, maintain and operate thereupon such new industry * * * and such sites * * * shall not be deemed to be 'property acquired, owned or held for any public use or devoted thereto' as used herein."

"Industry" is defined as follows: "The result of operations whereby man changes and makes fit for his use materials which were unserviceable in their natural state". 43 C.J.S., Industry, page 40, note 6.

" 'Trade' is defined as 'commercial enterprises,' and 'industries' as that branch of trade employing capital and labor." People Ex. rel. Padula v. Hughes, 296 Ill. App. 587, 16 N.E.2d 922, 924.

"Any department or branch of art, occupation or business; especially one which employs much labor and capital and is a distinct branch of trade; as the sugar industry." Webster's New International Dictionary, Second Edition, cited with approval in State Ex. rel. K. C. Power and Light Company v. Smith, 342 Mo. 75, 111 S.W.2d 513, 515; Dessen v. Department of Labor, etc., 190 Wash. 69, 66 P.2d 867, 869 (the oyster industry).

The housing industry which sprang up during World War II is an in-

dustry using untold millions of dollars of capital and enormous numbers of men and women employees. It seems to be included in the definitions of industry above mentioned. It is believed, therefore, that under Chapter 27, S.L.A. 1945, which became the second paragraph of Section 16–1–35, page 197, S.L.A. 1949, and later the second paragraph of Chapter 61, S.L.A. 1951, with the exception that the word "property" was erroneously spelled "properly" in the next to the last line on page 158, Chapter 61, S.L.A. 1951, the Common Council of Fairbanks, Alaska, has authority to sell, lease, or dispose of available sites upon such terms as may be deemed by it advantageous to the civic welfare of the municipality, to such persons as will agree to install, maintain, and operate thereon such new industries. It is believed that the housing propositions mentioned in Propositions 3 to 9, inclusive, on said official ballot would constitute new industries which would benefit the civic welfare of the municipality of Fairbanks, Alaska. There is no requirement in said Chapter 27 for a ratification by the voters of the action of the Common Council as to such sites. The chapter specially provides that such sites "shall not be deemed to be property acquired, owned, or held for any public use or devoted thereto."

Thus, under said Chapter 27 the Common Council of Fairbanks, Alaska, could sell, lease, or otherwise dispose of the lands mentioned in Propositions 3 to 9, inclusive, of said official ballot by making such land available as sites for new housing industries. Under the terms of said chapter it would be necessary for the Common Council of Fairbanks to find that the sale of such sites would benefit the civic welfare of the municipality and that the terms of such sale or sales were deemed by the Common Council to be advantageous to the civic welfare of the municipality. An agreement on the part of grantees in the deed, or lease, to install, maintain and operate such industries on such sites would likewise be necessary to comply with said chapter.

Perhaps the Common Council of the Town of Fairbanks and the grantees of new industries have already done all that is required of them under said Chapter 27. However, there is no direct showing of compliance with said Chapter 27 made in the pleadings or affidavits upon which this application for a temporary injunction is based. Under said Chapter 27 it is immaterial whether the property in any site mentioned therein was held for a public use or otherwise, as the chapter specifically states that the sites shall not be deemed to be "property acquired, owned or held for any public use or devoted thereto".

Said Chapter 27, S.L.A. 1945, plays no part with the rights of the plaintiffs in this case, inasmuch as they have no rights in said airport, as no dedication thereof for a public use was ever made.

As is shown by an analysis above set forth with reference to said Chapter 27, S.L.A. 1945, the Common Council of Fairbanks has not made any of the findings which are required in order to sell the municipal property of the Town of Fairbanks, Alaska, or the propositions set forth in Intervenor's Exhibit B or the Denali School premises. The fact that the intervenor and perhaps others have a right to get some of such findings from the City Council does not assist the plaintiffs in making out their case.

## Sec. VI

### Gillam Easement

(a) Presumably to show a special interest in the subject-matter of this action, the plaintiffs allege that one Harold Gillam as party of the first part executed a deed on August 17, 1940, in favor of the Town of Fairbanks, Alaska, grantee (Exhibit M), conveying Lots 1 and 2 of the Rickert Homestead. The plaintiffs claim that Mr. Gillam was the owner of an easement or right-of-way between Lot 3 of said Rickert Homestead and Weeks Field. The deed which was executed by Harold Gillam to the Town recites a consideration to him in hand paid and further alleges: "and a further consideration that said party of the first part shall have a continuous, free, and unobstructed right-of-way to and from the Fairbanks Municipal Airport to Lot 3." Mr. Gillam alone signed

the deed. The recital that he is to have that right-of-way constitutes a self-serving declaration which would not be binding upon the Town of Fairbanks and would not constitute any note or memorandum signed by the party to be bound, to wit, the Town of Fairbanks.

"An easement must rest upon a grant thereof; it cannot exist by parol." 17 A.J. 936, par. 18.

"Generally, when an easement is created by express grant, words of inheritance are necessary to make it a perpetual interest. This is said to be the rule also as to easements by reservation * * *. Thus, it has been held that the word 'heirs' is necessary to create an easement in fee by way of reservation, but not to create it by way of exception if the grantor owns the fee at the time of the conveyance." 17 A.J., p. 943–944, § 31.

Gillam's deed imports an oral contract between him and the Town of Fairbanks. It does not set forth a description of the land over which the right-of-way is to run and therefore it lacks an essential element of an easement, which requires both a dominant and a servient tenement. 17 A.J., page 925, N. 11.

Gillam's rights were a mere license, and such license terminates upon the death of either party and is not transferable or descendible. 17 A.J., p. 926, par. 5 and p. 927, N. 9.

Paragraph VI of plaintiffs' amended complaint alleges that Gillam, in executing the deed, *retained a right-of-way* and that the plaintiffs Northern Consolidated Airlines and Fred Seltenreich and others are successors and assigns of said Gillam. The intervenor has denied all of the allegations of said paragraph VI. An examination of the deed shows that Gillam did not in any possible way retain or except or reserve a right-of-way from the operation of the deed. The only thing we have about a right-of-way is Gillam's own statement appearing in the deed which he, himself, was executing.

As Gillam had nothing more than a license which was unassignable and which could not be inherited, said alleged right-of-way was a mere license which became of no effect when assigned to the plaintiffs.

The question of said easement is immaterial, inasmuch as plaintiffs' case depended upon there being a dedication of Weeks Field and as the evidence shows no such dedication to have existed.

(b) In paragraph XI of plaintiffs' amended complaint it is stated: "That each of the plaintiffs herein is engaged in the aircraft or an allied business at or adjacent to Weeks Field; are property owners adjacent to said Weeks Field and have vested property interests therein."

The defendant and intervenor have denied the matters set forth in said paragraph XI above mentioned. Other than as to the alleged Gillam easement no evidence of any sort was introduced by the plaintiffs to substantiate any of the allegations in said paragraph XI. As the burden of proof is upon the plaintiffs to prove the allegations of their amended complaint by a preponderance of the evidence in the case, and the plaintiffs having failed entirely so to do, it becomes apparent that even if Weeks Field had been properly dedicated to a public use the plaintiffs could not have prevailed herein in their application for a preliminary injunction because of failure to show any special damage by reason of the action of defendant and/or intervenor. McCormick v. Chicago Yacht Club, 331 Ill. 514, 163 N.E. 418; 60 A.L.R. 770; 16 A.J. p. 414, § 67.

(c) The evidence (and by this I mean the pleadings and affidavits upon which this cause was submitted) shows that the intervenor has built a schoolhouse costing $660,000 upon said Weeks Field and that if a preliminary injunction were granted in this case the intervenor would be unable to use said school by reason of the danger of injuring and killing some of the 450 school children if planes were permitted to land and take off from Weeks Field; that intervenor would simply have to close down the schoolhouse and rent quarters in basements, churches, and other places around town at a cost of $134,800 during the probable time before final judgment herein. This matter was set forth by affidavit and by intervenor in its first affirmative de-

fense, and no denial of the same was made by plaintiffs.

There is no showing by the plaintiffs of any damage to them in any specific amount if the preliminary injunction be denied. There are general statements of irreparable loss, etc., in paragraph XVI of the amended complaint. Paragraph XVI of said amended complaint is denied by the defendant and intervenor and no showing of loss was made by plaintiffs other than the allegations above mentioned in said paragraph XVI. It thus appears that the loss which would be incurred by the intervenor from the allowance of a preliminary injunction would be many times greater than that which would be suffered by the plaintiffs, which would furnish a sufficient ground for denying the preliminary injunction.

(d) As the decisions of the Supreme Court show that plaintiff must have a clear right to the issuance of a preliminary injunction, it appears that no such injunction should be issued in this case. Ohio Oil Company v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972; Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; Mayo v. Lakeland Highlands Cannery Co., 309 U.S. 310, 60 S.Ct. 517, 84 L.Ed. 774.

(e) It is alleged in defendant's third further and affirmative defense set forth in the answer and in intervenor's third affirmative defense to plaintiffs' amended complaint that the plaintiffs are indebted to the defendant for the use of Weeks Airport in the past in the following sums:

| | |
|---|---|
| Northern Consolidated Airlines | $5,500 |
| Fairbanks Air Service | $ 565 |
| Alaska Flying School | $ 480 |

The allegations of said indebtedness are not denied by plaintiffs.

While said indebtedness might throw some light on the financial standing of said plaintiffs it would not seem that said indebtedness should constitute a bar in this equitable suit under the maxim that he who seeks equity must do equity and must come into the court with clean hands.

Plaintiffs have made no showing whatsoever that the defendant or the intervenor is unable to respond in damages to any extent that is probable in this action.

From the above matters it appears that plaintiffs' application for a preliminary injunction, as mentioned above, should be denied.