CHERRY LANE FARMS OF MONTANA, INC., Plaintiff
and Appellant, *v.* GILBERT CARTER, as Treasurer of
Gallatin County, et al., Defendants and Respondents.

No. 11607.
Submitted June 9, 1969.
Decided July 1, 1969.
456 P.2d 296.

Morrow, Nash Sedivy, James H. Morrow, Jr., and Edmund P. Sedivy, (argued), Bozeman, for plaintiff and appellant.

Leo J. Kottas, Jr., (argued), Helena, Anderson, Brown & Gilbert, Bozeman, for defendants and respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment entered in the district court of the eighteenth judicial district in favor of the defendants Gallatin County and the State Board of Equalization, hereinafter referred to as "respondent", and against the plaintiff, Cherry Lane Farms of Montana, Inc., hereinafter referred to as "appellant".

The facts of this case can be summarized as follows: During the years 1965, 1966 and 1967, appellant purchased 6.17 acres of land in the city of Three Forks, county of Gallatin, constructed buildings thereon and purchased machinery, fixtures and equipment for the purpose of producing, processing and packaging chicken eggs. Appellant made application to the Montana State Board of Equalization, as required by its regulations, for classification as a new industry property. The Board denied the appellant's application. Thereafter the Gallatin county tax equalization office classified the property as "commercial" as distinguished from "agricultural". If the property levied on is within the new industry classification, as re-

quested and argued for by the appellant, the tax assessment values are reduced from 30% in case of real estate and 20% in case of equipment to 7%, making for a reduction of $2,635.78 of dollar levy per year for a period of 3 years.

The decision of the State Board of Equalization was appealed to the district court of Gallatin county and this appeal is taken from the judgment of that court.

At the trial three expert witnesses testified concerning the appellant's operations and their testimony can be summarized as follows: The chickens, of a special type, are purchased as day-old chicks from a hatchery in the state of Washington and shipped into Montana in boxes by specially designed trucks. Prior to egg production the chickens are placed in brooder houses for a period of 20 weeks. Their environment of temperature, light, food, water, and air is completely controlled. The diet for the chickens is scientifically regulated requiring special high and low energy level formulas under the advice and consultation of a nutritionist. The chickens are vaccinated at different intervals. For egg production, the chickens at the age of 20 weeks are placed into layer plants, wherein correct nutrition is required for quality and quantity of egg production. The environment is again, completely controlled. The laying state for the chickens is 19 months and they then are sold as stewing hens for about one half the price of the original chicks.

As a result of special breeding, under the direction of geneticists, the chickens used have the ability to produce 240 eggs per year.

The equipment in the brooder and layer buildings consists of automatic electric feed carts and manure carts, and electric carts used to pick up the eggs. There are also bulk feed tanks, feed troughs, and egg roll outs. In the processing building there is a reefer (refrigeration room), for over-night storage, and a fully mechanized Page-Detroit processing system which uses a series of conveyor belts to automatically move the eggs through the various processes. For example, the system sprays, brushes,

and washes the eggs, then it sanitizes the eggs and dries them. The eggs are then candled and graded, weighed and classified and then packaged into cartons. In the cartons, the egg shells are then sprayed with mineral oil. The cartons are then closed, packaged and stored, prior to being shipped to market. The eggs are then hauled by the appellant's outlets within and outside the state of Montana.

The plant was located in Montana, as opposed to Spokane, Washington, because of the market, source of grain and reduction of freight overhead, and at Three Forks because it is centrally located for distribution in the state and it has a moderate climate. The beginning and overall plan is to have four layer houses, two brooder houses, and a processing plant to take care of 108,000 laying chickens so as to put into average daily production 76,000 eggs. The capital investment will be $450,000. There are presently 13 year-around employees having an annual payroll of $50,000.

The appellant must comply with both federal and state laws and regulations for egg distribution and marketing as to licensing, testing, candling, weighing, grading and sizing. Montana tax seals are required at a cost of $1.50 per thousand eggs. The eggs sold within and outside of Montana. The eggs must pass inspection by inspectors at a retail level as well as the plant. The eggs could not be marketed without such compliance.

Dr. Richard J. McConnen, head of the Department of Agricultural Economics of Montana State University described the activity of appellant as differing from traditional agriculture. He termed the operation of Cherry Lane Farms, Inc. as Agri-Business, since the business uses the input, sells the output, and processes and concentrates the product. The business further is distinguished from traditional agriculture by reason of the vertical integration of its organization. Vertical integration occurs where all the links in hte chain of production are under the head of one management, for instance, the buying of the feed, preparing the ration, feeding it, the processing and marketing

of the eggs. The system is also called a single-profit center system. This new type of industry, or "agri-business" has developed in the poultry business because of the demands of the market place, and such terminology has been used in the business for some 15 years now; and specifically used at a conference of Montana State College in 1957. This was prior to the passage of the 1961 new industry law. Dr. McConnen also distinguished the operation of Cherry Lane Farms, Inc. from an agricultural operation because of the greater detail and care and management decision required to attempt to control the environmental standards. He likened the operation to a greenhouse. The surroundings of the poultry industry have changed from traditional agriculture.

We are concerned here with two tax statutes of this state, section 84-301 and section 84-302, R.C.M.1947. Both of these statutes were amended by Chapter 239, Laws of 1961. Section 84-301 was amended to provide a new classification—class seven, new industrial property, and section 84-302 was amended as to the basis of class operation so that class seven was given a 7% basis.

We now set forth the sections of Chapter 239, Laws of 1961, pertinent in this case:

"Section 1. Statement of Purpose. The legislative assembly of the State of Montana hereby declares that it is in the best interests of the people of this state to encourage and stimulate the establishment of new industry within Montana. It recognizes that a new industrial plant does not reach full productivity and competitive capacity during the initial years of its operation. Since taxation of property should be related to property in proportion to its use, productivity, utility, and general setting in the economic organization of society, the purpose of this act is to provide a separate classification for new industrial property which gives proper recognition to these factors and places such property in the proper class for taxation purposes.

"Section 2. * * * 84-301. Classification of Property for

Taxation. For the purpose of taxation the taxable property in the state shall be classified as follows: * * *

"Class Seven. All new industrial property. New industrial property shall mean any new industrial plant, including land, buildings, machinery and fixtures which, in the determination of the state board of equalization, is used by a new industry during the first three (3) years of operation not having been assessed prior to July 1, 1961 within the State of Montana. New industry shall mean any person, corporation, firm, partnership, association, or other group which establishes a new plant or plants in this state for the operation of a new industrial endeavor, as distinguished from a mere expansion, reorganization, or merger of an existing industry or industries. Provided, however, that new industrial property shall be limited to industries that manufacture, mill, mine, produce, process or fabricate materials, or do similar work in which capital and labor are employed and in which materials unserviceable in their natural state are extracted, processed or made fit for use or are substantially altered or treated so as to create commercial products or materials; and in no event shall the term new industrial property used by retail or wholesale merchants, commercial services of any type, agriculture, trades or professions. And provided further, that new industrial property shall not be included to mean property which is used or employed in any industrial plant which has been in operation in this state for three (3) years or longer. Any person, corporation, firm, partnership, association or other group seeking to qualify its property for inclusion in this class shall make application to the state board of equalization in such manner and form as may be required by said board * * *

"Section 3. * * * 84-302. Basis for Imposition of Taxes. As a basis for the imposition of taxes upon the different classes of property specified in the preceding section, a percentage of the true and full value of the property of each class shall be taken as follows: * * *

"Class 7. Seven per cent of its true and full value. * * *''.

The sole issue before this Court is whether the property owned by the appellant is new industrial property specially provided for by the legislature when class seven was established as a separate classification.

Since 1951 the legislature of this state has been interested in a tax incentive program to bring new industry into Montana. In 1951 the legislature passed Sec. 1, Chapter 178, Laws of 1951, which amended section 84-301, R.C.M.1947. This act was declared unconstitutional by this Court in 1956 in the case of Victor Chemical Works v. Silver Bow Co., 130 Mont. 308, 301 P.2d 730, the majority of the Court being of the opinion that the 1951 law did not set up a classification of property for taxation within our constitution in that it worked a ''discrimination in favor of one as against another of the same class''. It should be noted here that there was no attack on the constitutionality of Chapter 239, Laws of 1961, in the instant case. Mr. Justice Angstman in the Victor Chemical Works case, dissenting in part and concurring in part, agreed with the majority that an act of this kind could be passed that was constitutional and said:

"In my opinion a statute could be enacted to encourage new industries to enter Montana, which would have the effect of giving them a tax benefit for a three year period without violating sections 1, 2, 7, or 11 of Article XII, of our Constitution, and without violating the rule of the cases of Cruse v. Fischl, 55 Mont. 258, 175 P. 878, and Stoner v. Timmons, 59 Mont. 158, 196 P. 519, if there was not undue discrimination against a going concern engaged in the same business in the same locality.

"Such a statute would be a classification and not an exemption statute. It would place the property in a different class for the first three years of its operation.

"As pointed out in the majority opinion, where the Constitution does not prohibit the granting of exemptions it has been held that the legislative power to exempt industrial plants from taxation for a limited period as an inducement to the location of

the same in the state cannot be questioned, and 'Whether the benefits to accrue warrant such exemption is a matter of legislative policy.' Crow v. General Cable Corporation, 223 Ala. 611, 137 So. 657, 658. It is better if the legislature so determines to grant special tax consideration for a limited period than not to have the industry in the state at all.

"The purpose of such exemption statutes is to encourage the location of industries in the state, thereby affording labor to more people, distributing payrolls in the community and increasing the value of property generally in the community, due to the necesity of providing homes for more people and the general circulation of more money in the community. Illinois Central Railway Co. v. City of Paducah, 228 Ky., 65, 14 S.W. 2d 172; County Commissioners of Carroll County v. B. F. Shriver Co., 146 Md. 412, 126 A. 71.

"The legislature of this state has power to classify property for the purpose of taxation. Hilger v. Moore, supra, [56 Mont. 146, 182 P. 477].

" 'The use to which the property is devoted and its productivity is the measuring stick in determining its proper classification under the act for the purposes of fixing the tax. Although such machinery may be used in manufacture, yet we are of opinion that the use to which it is actually devoted is controlling for purposes of taxation. Barnard Realty Co. v. City of Butte, 50 Mont. 159, 145 P. 946,' Chicago, Milwaukee & St. Paul Railway Co. v. Powell County, 76 Mont. 596, 247 P. 1096, 1097.

"To the same effect is Bank of Miles City v. Custer County, 93 Mont. 291, 19 P.2d 885; Chicago, Milwaukee, St. Paul & Pacific Railway Co. v. Custer County, 96 Mont. 566, 32 P.2d 8; Wheir v. Dye, 105 Mont. 347, 73 P.2d 209.

"Whether or not a particular classification may stand depends upon whether it precludes the assumption that it was made in the exercise of legislative judgment and discretion. Bank of Miles City v. Custer County, spra; Montana Beer Re-

tailers' Protective Association v. State Board of Equalization, 95 Mont. 30, 25 P.2d 128.

"A distinction or classification made by the legislature is not arbitrary if any state of facts reasonably can be conceived that would sustain it. [Citing cases]

"As above pointed out there are many things which the legislature might reasonably have regarded as beneficial to the state and its people and as sufficient cause to encourage the bringing in of new industries into the state by thus classifying their property for taxation purposes for a period of three years."

While much has been written and said in the briefs and arguments of both parties in this case about the nature of the appellant's business and what the legislature meant by the term "agriculture" in class seven, we find the controlling factor lies in Section 1 of Chapter 239, Laws of 1961, "Statement of Purpose". From the reading of this section it is clear that the legislature in its second effort to provide tax consideration for new industry gave heed to the words of Justice Angstman in the Victor Chemical Works opinion for the title of the act and the statement of purpose is clear in that it provides a new classification for property taxation. Its purpose can be understood by all to embrace the procesing and treating of all kinds of raw products of this state in a new plant or plants.

This Court by the statutes and the case law of this state is directed, in interpreting statutes, to carefully consider and pursue the intent of the legislature, if possible. The statutory rules as applied to this case are:

(1) "Section 93-1001-15. The recitals in a public statute are conclusive evidence of the facts recited for the purpose of carrying it into effect, but no further. * * *."

(2) "Section 93-401-15. In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted ,or to omit what has been inserted; and where there are several provisions or particulars,

such a construction is, if possible, to be adopted as will give effect to all.''

(3) ''Section 93-401-16. In the construction of a statute the intention of the legislature * * * is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it.''

The case law of this state long age established that in construing statutes the intention of the legislature is to be followed, if possible, and they must be construed in reference to the subject matter and objects which prompted and induced the legislature to act. Doull v. Wohlschlager, 141 Mont. 354, 377 P.2d 758; Montana Chapter, Nat. Elec. Con. Ass'n, v. Bd. of Ed., 137 Mont. 382, 352 P.2d 258; Wilkinson v. La Combe, 59 Mont. 518, 197 P. 836.

In considering a tax statute it has been the long settled rule that where a taxing statute is susceptible of two constructions any reasonable doubt as to persons or property intended to be within a particular tax should be resolved in favor of the taxpayer and against the taxing authority. Swartz v. Berg, 147 Mont. 178, 411 P.2d 736; State ex rel. Anderson v. State Bd. of Equal., 133 Mont. 8, 319 P.2d 221.

It is well established that when the terms of a statute are plain, unambiguous, direct and certain, the statute speaks for itself and there is nothing for this Court to construe. In re Kesl's Estate, 117 Mont. 377, 161 P.2d 641. In our view the words of sections 84-301 and 84-302, R.C.M.1947, are plain, unambiguous and certain. The legislature, in order to bring ''new industry'' into Montana contemplated just such a new plant as we have here. Simply because products of agriculture are used in the industry does not eliminate it from the benefits of the act; to so argue would deny the state the industrialization benefits from our greatest asset—agriculture. Much of our industrial potential rests on our natural resources.

The judgment of the district court is reversed and the court is directed to issue an opinion consistent with this opinion.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES, HASWELL and BONNER, concur.