John LIBBY, Mark Johnson, and Steven Nicholson, Appellants,

v.

CITY OF DILLINGHAM, a Municipal Corporation, and Engstrom Brothers Company, Inc., Appellees.

No. 3861.

Supreme Court of Alaska.

May 23, 1980.

**34**

R. Eldridge Hicks, Ruskin, Baker & Hicks, Anchorage, for appellants.

Gary Thurlow, Croft, Thurlow, Loutral & Duggan, Anchorage, for Dillingham.

Allan A. Engstrom, Juneau, for Engstrom Bros.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

This case originated as an action by three taxpayers of the City of Dillingham seeking to enjoin the City of Dillingham and Engstrom Brothers Company from acting in accordance with an agreement to lease a cold storage facility on the grounds that the lease did not comply with the competitive bid requirements of Alaska Statutes and Dillingham Ordinances. All parties moved for summary judgment. The superior court granted the City's motion and entered final judgment in favor of defendants. Plaintiffs have appealed that judgment. We conclude that the lease in question was subject to competitive bid requirements, and we therefore reverse the decision of the superior court.

## I. Statement of the Facts [1]

From 1969 through 1971, the Economic Development Administration (EDA) financed the construction of a cold storage plant for the City of Dillingham (City). Following its completion, the facility was leased to the Nushagak Fishermen's Cooperative, Inc. (Nushagak). The Nushagak operation was unsuccessful and did not operate after the 1972 season. On July 15, 1974, the City served Nushagak with a Notice of Default.

In February 1974 Elton Engstrom, President of the seafood processing company, Engstrom Brothers Company, visited the Dillingham cold storage plant and later wrote a letter to Sam Coxson, Dillingham City Manager, expressing an interest in leasing the plant for the 1975 season. During the summer of 1974, Kemp and Paulucci Seafood, Inc., also expressed interest in operating the cold storage facility. On September 16, 1974, Louis Kemp presented a detailed lease proposal to the Dillingham City Council and shortly thereafter sent a letter to Mayor Roberts, further elaborating the proposal. On September 19, 1974, Engstrom Brothers Company submitted a proposal to Sam Coxson. On September 21, 1974, Coxson submitted a counterproposal to Kemp and Paulucci which Louis Kemp signed and returned to the City with minor modifications.

When Kemp received information that details of his proposal had been revealed to Engstrom Brothers Company, he contacted Alaska counsel, and upon being informed of competitive bid requirements, Kemp authorized his attorney to notify the City that he was demanding that the City comply with those requirements. On October 17, 1974, the attorney sent the City a telegram, citing the specific requirements of AS 29.48.-260.[2] On October 18, 1974, Coxson, in apparent response to the Kemp telegram, wrote a memorandum to the City Council, indicating that "the state requires sealed bid proposals versus the executive session negotiation method which the city used" and informed the Council that he was going to prepare bid specifications. This memo-

---

1. The briefs on appeal and the memoranda submitted to the court below contained many allegations of fact which were not cited to or supported by the record. We have held that "assertions of fact in unverified pleadings and memoranda" should not be relied on in ruling on a motion for summary judgment. *Jennings*

*v. State*, 566 P.2d 1304, 1309–10 (Alaska 1977). In deciding this appeal we have considered only those facts contained in the affidavits, exhibits and depositions which were before the superior court.

2. Set forth in note 5 *infra*.

randum implies that a decision had already been made to award the lease to Engstrom Brothers Company: "Unfortunately, it does [affect] Mr. Engstrom in that he must come back in and bid by sealed bid for something that he already had."

The City subsequently issued invitations for bids on three occasions, announcing scheduled bid openings on December 6, 1974, January 16, 1975, and January 29, 1976,[3] respectively. During the period between the second and third bid invitations, EDA advanced more money to the City to cover the expenses of the vacant cold storage plant. EDA strongly urged the City to locate a lessee for the plant; and in a letter of November 12, 1975, EDA finally indicated that funds for the renovation of the plant would be made contingent on the execution of a lease.

During this period between the last two bid invitations, Kemp and Paulucci continued to express an interest in leasing the facility. In September, 1975, Kemp visited Joe McGill, the new city manager, in Dillingham and inquired about the status of the plans for the facility. In response to a notice from the City, Kemp sent his engineer, Walter Butler, to a design meeting with EDA officials in Anchorage on January 5, 1976. During this period, the City attempted several times to contact Kemp or Butler by telephone but was unable to locate them. There were, however, numerous contacts between the City and Engstrom Brothers Company during this period, including at least three telephone calls and six letters.

No bids were submitted in response to any of the three bid invitations apparently because the City's terms were unduly restrictive.[4] Following the third bid opening date, in a telephone conversation and by letter, Kemp and Paulucci proposed to the City that interested operators be invited to submit proposals to the City rather than having the City set up specifications, but Kemp and Paulucci received no response to this suggestion. During this period, however, McGill met with Elton Engstrom in Seattle and with Elton Engstrom's attorney in Anchorage, and during these meetings the terms of a lease for the 1977 season were negotiated. The Engstrom lease was subsequently approved and accepted by the Dillingham City Council on February 16, 1976. The record reveals no negotiations with Kemp and Paulucci or any other processor during this period.

Three Dillingham taxpayers subsequently brought suit against the City and Engstrom Brothers Company, alleging that the lease agreement had been entered into in violation of the bid requirements of the Alaska Statutes and Dillingham Ordinances. In response to the parties' motions for summary judgment, the superior court ruled (1) that the Dillingham cold storage facility was a "beneficial new industry" within the meaning of AS 29.48.260(e)[5] and (2) that such new industries are exempt from the competitive bid requirements of Dillingham

---

3. The third bid opening was originally scheduled for January 12, 1976, but it was postponed until January 29, after Elton Engstrom notified Joe McGill, the new Dillingham city manager, that he could not meet the January 12 bid deadline.

4. On November 22, 1974, while the first bid invitation was still open, Elton Engstrom had written to Sam Coxson, informing him that "the terms of your proposed lease are onerous in light of the situation of your plant, requiring extensive work to make it effective and operable." Kemp has also stated that he did not bid because "in light of the deteriorated condition of the processing facility, the minimum requirements of the bid lease were simply too restrictive and too costly . . . ." Only minor changes were made in the terms of the second lease for which bid invitations were issued.

During the January 5, 1976, design meeting in Anchorage, Walter Butler, the engineer who represented Kemp and Paulucci at the meeting, suggested to the Dillingham city attorney and to Joe McGill, the city manager, that the new bid specifications should "permit greater flexibility" than the previous proposals. The specifications in the third invitation, however, were substantially similar to those of the previous invitations, and no bids were received.

5. AS 29.48.260 at the time in question provided (emphasis added):

*Municipal properties.* (a) A municipality may acquire and hold real and personal property or interest in property, and may sell, lease or otherwise dispose of property no longer required for municipal purposes.

(b) *Notwithstanding the provisions of (c) of this section*, a municipality may sell, lease, do-

Ordinance No. 22, section III,[6] and AS 29.-48.260(c).[7]

nate or exchange with the United States, the state, or a political subdivision real estate or other property, or interest in property, when in the judgment of the assembly or council it is advantageous to the municipality to do so.

(c) The assembly or council shall by ordinance establish a formal procedure for the sale, lease or disposition of real property or interest in real property. The ordinance shall require (1) an estimated value of the property by a qualified appraiser or the assessor; (2) a notice of sale published in a newspaper of general circulation distributed within the municipality at least 30 days before the date of the sale, lease, or disposition, or posted within that time in at least three public places in the municipality; (3) *public auction or opening of sealed bids*, if any; and (4) other terms and conditions fixed by the assembly or council. However, no ordinance for the sale, lease, or disposition of real property or interest in real property valued at $25,000 or more is valid unless ratified by a majority of the qualified voters voting at a regular or special election at which the question of the ratification of the ordinance is submitted. Thirty days notice shall be given of the election and during that period the assembly or council shall have published at least once a week in a newspaper of general circulation distributed within the municipality a notice stating the time of the election and the place of voting, describing the property to be sold, leased or disposed of, giving a brief statement of the terms and conditions of the sale and the consideration, if any, and stating the title and date of passage of the ordinance. Notice shall also be given by posting a copy of it in at least three public places in the municipality at least 30 days before the election. If no newspaper of general circulation is distributed within the municipality, the notice given by posting is sufficient for the purposes of this section.

(d) The assembly or council may by ordinance establish a formal procedure for acquisition from the state of land or rights in land and the disposal of the land or rights in land, *in which event the provisions of (c) of this section do not apply.*

(e) A municipality, in order to *make sites available for beneficial new industries,* may acquire and hold real property, either inside or outside the corporate limits, and may sell, lease or dispose of it to persons who agree to operate a beneficial new industry *upon the terms and conditions the assembly or council considers advantageous to the municipality.*

**6.** Dillingham Ordinance No. 22 provides in part (emphasis added):

AN ORDINANCE PERTAINING TO THE SELLING, LEASING, EXCHANGING, AND DONATING OF CITY PROPERTY, AND SUPERCEDES ALL PREVIOUS ORDINANCES WHICH MAY BE IN CONFLICT WITH THE FOLLOWING:

## II. Is the Dillingham Cold Storage Plant a Beneficial New Industry?

*SECTION I.*

The Board of Trustees may acquire by purchase or otherwise real estate and other property, or any interest in property, and may sell, lease or dispose of its real estate and other property or interest in property, including property acquired or held for or devoted to a public use, when in the judgment of the Board of Trustees it is no longer required for municipal purposes.

*SECTION II.*

The Board of Trustees may sell, lease, donate or exchange with the United States, the State, or any political subdivision real estate or other property, or interest in property whenever in the judgment of the Board of Trustees it is advantageous to do so.

*SECTION III.*

Prior to the sale, lease or disposition of real property or interest in real property the City shall:

A. Obtain an estimated value of the property by a qualified appraiser or the assessor, or in the case of land, obtain the estimated value by determining the square feet assessed value of adjacent land;

B. Publish a notice of sale or lease in a newspaper of general circulation in the City at least 30 days before the date of the sale, lease or disposition and posted within that time in at least three public places in the City for 30 days;

C. In the absence of a newspaper of general circulation in the City notice of sale, lease or disposition shall be posted in at least three public places in the City for 30 days;

D. *Require sealed bids with public opening or public auction* at a time and place designated by the Board of Trustees, City Manager or his representative;

E. Shall determine the minimum acceptance bid;

F. Shall, at the time of sale or lease, require of the successful bidder a deposit in an amount equal to one-tenth of the purchase price;

1. The City shall immediately issue a receipt containing a description of the land or property purchased, the price bid, and the terms of the sale, which receipt shall be acknowledged by the bidder.

2. Terms of the contract of sale or lease agreement shall specify how the remainder of the purchase or lease shall be paid.

*SECTION IV.*

Sale, lease, or disposition of real property or interest in real property valued at $25,000 or more (or the amount specified in the Alaska Statutes) is invalid *unless ratified by a majority of the qualified voters voting at a general or special election.*

AS 28.48.260(e) authorizes a municipality to lease real property to persons who agree to operate a "beneficial new industry." [8] Such a lease may be "upon the terms and conditions the assembly or council considers advantageous to the community." AS 29.-48.260(e). The City contends that this section exempts leases to beneficial new industries from competitive bid requirements. The City further contends that the Dillingham cold storage plant is such a "beneficial new industry" and is therefore exempt from the competitive bid requirements.

The statute itself does not define "beneficial new industry," [9] and there are no Alaska cases construing the term.[10] We therefore turn for guidance to cases from other jurisdictions which have construed similar terms. Most of these cases involve tax advantages that are available only to new industries.[11] A few involve statutes estab-

7. Set forth in note 5 *supra*. The superior court's order provided:

1. The Dillingham cold storage is a "beneficial new industry" within the meaning of AS 29.48.320(e).
2. The Dillingham cold storage is a "beneficial new industry" exempt from the competitive bid requirements of AS 29.48.320(c) and City of Dillingham Ordinance No. 22, Section VII.

The reference to "AS 29.48.320" is apparently an oversight, since the pertinent statute is obviously AS 29.48.260. The reference in the order to section VII of the ordinance, rather than to section III, is also apparently an oversight. While section VII does refer to "new industries," it is section III that imposes the competitive bid requirements. *See* text of Ordinance No. 22 in note 6 *supra*.

SECTION V.
The Board of Trustees retains the right to sell, lease or dispose of real property which has not been acquired, held or devoted to a public purpose. No ratification of sale of lands or the execution of deed is required under conditions of this section.

SECTION VI.
The Board of Trustees retains the right to abandon property when it is determined to be in the best public interest.

SECTION VII.
The Board of Trustees may sell or lease sites to operators of *new industries* or for new housing industries *without the requirement for ratification by the voters.*

SECTION VIII.
The successful bidder shall within two (2) working days after the bid opening or auction pay to this City the full cash value of the property to be purchased or leased. Failure to meet this requirement shall invalidate the sale and result in forfeiture of the ten percent (10%) deposit required by SECTION III F.

SECTION IX.
The successful bidder shall be required to be current on all City levied taxes within two (2) working days after the bid opening or auction. Failure to meet this requirement shall invalidate the sale and result in forfeiture of the ten percent (10%) deposit required by SECTION III F.

8. *See* text of AS 29.48.260 in note 5 *supra*.

9. Definitions of several other terms used in title 29 are set forth in AS 29.78.010.

10. In *Seltenreich v. Town of Fairbanks*, 103 F.Supp. 319 (D.Alaska 1952), *aff'd*, 211 F.2d 83 (9th Cir. 1954), the federal territorial court considered the twentieth subdivision of § 16–1–35, ACLA 1949, which was the predecessor statute to AS 29.48.260. The court held that the statute permitted a sale of municipal property for a subdivision without voter ratification of the sale, since "housing" was a "new industry" within the meaning of the statute. 103 F.Supp. at 335. The court cited authority to support its conclusion that housing was an "industry," but the opinion includes no discussion of the basis for the conclusion that the industry was "new."

11. Most of the tax exemption cases conclude that the business in question is not a "new industry." *See, e. g., City of Louisville v. Louisville Tin & Stove Co.*, 170 Ky. 557, 186 S.W. 124 (1916); *Mengel Box Co. v. Sea*, 167 Ky. 193, 180 S.W. 347 (1915); *B. F. McCormick Lumber Co. v. City of Winchester*, 155 Ky. 494, 159 S.W. 997 (1913); *City of Louisville v. New York Baking Co.*, 151 Ky. 758, 152 S.W. 980 (1913); *Victor Cotton Oil Co. v. City of Louisville*, 149 Ky. 149, 148 S.W. 10 (1912); *Louisville & N.R. Co. v. City of Louisville*, 143 Ky. 258, 136 S.W. 611 (1911); *Continental Tobacco Co. v. City of Louisville*, 123 Ky. 173, 94 S.W. 11 (1906); *Morris v Riley*, 135 Miss. 1, 99 So. 466 (1924); *Robertson v. Mississippi Packing Co.*, 134 Miss. 837, 98 So. 539 (1924); *Davis Mechanical Contractors, Inc. v. Wasson*, 268 S.C. 26, 231 S.E.2d 300 (1977); *C.W. Matthews Contracting Co. v. South Carolina Tax Comm'n*, 267 S.C. 548, 230 S.E.2d 223 (1976); *Chronicle Publishers, Inc. v. South Carolina Tax Comm'n*, 244 S.C. 192, 136 S.E.2d 261 (1964).

There are, however, a few tax exemption cases in which the court found that a "new industry" existed. *See, e. g., Mengel Box Co. v. City of Louisville*, 117 Ky. 735, 79 S.W. 255

lishing eligibility for discount railroad rates or exemptions from restrictions on importation of foreign labor.[12] We have been unable to discover any cases discussing the term "new industry" in the context of a municipality's authority to acquire or dispose of property, and none of the cases we have examined [13] has involved facts precisely analogous to those of the case at bar.

The cases are nevertheless helpful. The tax exemption cases,[14] for example, consistently refuse to find that a "new industry" exists where the business in question is merely an expansion or a continuation of an existing business, even if it has a new name or a new corporate form. *See, e. g., Chronicle Publishers, Inc. v. South Carolina Tax Commission*, 244 S.C. 192, 136 S.E.2d 261, 262 (1964) (special tax treatment not available to "a new corporation which has acquired and improved established businesses"). On the other hand, where an old corporation establishes a separate operation, entirely independent of its existing operation, the cases find that the new operation is a "new industry." *See, e. g., Arkwright Mills v. Murph*, 219 S.C. 438, 65 S.E.2d 665, 668–69 (1951) (new textile plant constructed five miles from existing plant, which continued in operation, not a "mere addition" and therefore entitled to special tax treatment). The distinction was stated succinctly in *City of Louisville v. Louisville Tin & Stove Co.*, 170 Ky. 557, 186 S.W. 124 (1916):

> [I]f defendant's plant . . . was, as a matter of fact, an entirely new manufactory which had not theretofore existed in the city, and it was induced to

locate its plant in the city by the offered exemption, the property in question is exempt. On the other hand, if the new plant was a mere expansion of a manufacturing business theretofore conducted, the property is not exempt.

██ We find that the term "new industry," as used in AS 29.48.260(e), refers to any newly organized business that is not a mere expansion or continuation of a business that has previously operated in the municipality. Since Engstrom Brothers Company was totally independent of the Nushagak Fishermen's Cooperative, Inc., its operation of the cold storage plant was not a continuation of that business. It was a separate and therefore new business in Dillingham. It was also a new *type* of business, for although its type of business was one that had previously been conducted by Nushagak, there was apparently no other cold storage plant actually in operation in Dillingham at the time.[15]

We conclude that the term "new industry" contemplates a newly organized enterprise, which may or may not be a new *type* of business. We do not believe, however, that *every* new enterprise comes within the statute, for the statute specifies "*beneficial* new industry." Thus, for example, if several cold storage plants were already doing business in Dillingham and were adequately fulfilling the needs of the community, it would probably not be proper for the city to lease land or facilities to an additional cold storage plant under AS 29.48.260(e). Even if it were a newly organized enterprise, so as to be a "new industry" within the mean-

(1904) (subsequently overruled in *Victor Cotton Oil Co. v. City of Louisville*, 149 Ky. 149, 148 S.W. 10, 11 (1912)); *Meador v. Mac-Smith Garment Co.*, 188 Miss. 98, 191 So. 129 (1939); *Cherry Lane Farms of Mont. v. Carter*, 153 Mont. 240, 456 P.2d 296 (1969); *Arkwright Mills v. Murph*, 219 S.C. 438, 65 S.E.2d 665 (1951); *Duke Power Co. v. Bell*, 156 S.C. 299, 152 S.E. 865 (1930).

12. *See, e. g., United States v. Bromiley*, 58 F. 554 (E.D.Pa.1893) (lace manufacturing is a new industry in the United States, one that is "struggling for existence, experimenting, hoping," and therefore is exempt from restrictions on importation of foreign labor); *United States*

*v. McCallum*, 44 F. 745 (D.Mass.1891) ("manufacture of any distinctly new product" is exempt from restrictions on importation of foreign labor); *Hawkeye Portland Cement Co. v. Chicago, R.I. & P. Ry.*, 198 Iowa 1250, 201 N.W. 16 (1924) (not a new industry for purpose of eligibility for lower railroad freight rates).

13. *See* cases cited in notes 11 & 12 *supra*.

14. *See* cases cited in note 11 *supra*.

15. Since the record includes no evidence to the contrary, we assume that there was no other cold storage facility in operation in Dillingham.

ing of AS 29.48.260(e), it would not be a "*beneficial* new industry," since it would provide no apparent benefit to the community. On the other hand, if a cold storage facility were operating in Dillingham but it was not able to satisfy the needs of the community, it might be proper for the city to thus lease land or facilities to a second cold storage operation. Although the second plant would not be a new *type* of industry, as a new enterprise that would benefit the community it would be a "beneficial new industry" within the meaning of AS 29.48.260(e).

Operation of the Dillingham cold storage plant by Engstrom Brothers Company was both a new enterprise and a new *type* of business, and it was apparently beneficial to the community.[16] We therefore hold that it was a "beneficial new industry" within the meaning of AS 29.48.260(e), and we consequently affirm the decision of the superior court on this issue.

### III. Is a Lease to a Beneficial New Industry Exempt from Competitive Bid Requirements?

■ The City contends that the disposition of property pursuant to AS 29.48.260(e) is not subject to the competitive bid requirements of AS 29.48.260(c).[17] The City

argues that, because a lease under AS 29.-48.260(e) may be "upon the terms and conditions the assembly or council considers advantageous to the community," a municipality may *negotiate* such a lease rather than putting it out to bid.[18] We disagree. We find that AS 29.48.260(e) merely sets forth a *purpose* for which municipalities are authorized to acquire and hold property; it does not affect the applicability of procedural requirements imposed by other parts of the statute.

■ We have not previously construed the statute in question, and we therefore start our analysis with the language of the statute itself.[19] It is a basic principle of statutory interpretation that, when possible, effect should be given to all provisions of a statute so that no part of the statute is superfluous. *See* 2A C. Sands, Sutherland Statutory Construction § 46.06 (4th ed. 1973) (hereinafter Sutherland). We find that AS 29.48.260(e), even when construed so as not to create an exemption from the competitive bid requirements, still has considerable meaning and importance.

AS 29.48.010(9) grants to municipalities the general power "to acquire, manage, con-

---

**16.** Appellants do not contend that the cold storage plant would not benefit the community.

**17.** Set forth in note 5 *supra*.

**18.** In opposing this argument appellants contend merely that any exemption for "sites" should be construed narrowly to include only undeveloped real property. This argument, however, is not persuasive, since AS 29.48.-260(e) refers generally to "real property," and the statute itself specifies that " 'real property' means land *and improvements*." AS 29.78.-010(13) (emphasis added).

**19.** The statute in question has come before the courts on two previous occasions. In *Seltenreich v. Town of Fairbanks*, 103 F.Supp. 319 (D.Alaska 1952), aff'd, 211 F.2d 83 (9th Cir. 1954), the federal territorial court considered the twentieth subdivision of § 16–1–35, ACLA 1949, which was the predecessor statute to AS 29.48.260. In *Seltenreich*, the court held that the statute permitted a sale of municipal property for a subdivision without ratification by the voters since "housing" was a "new industry." 103 F.Supp. at 335. *See* note 10 *supra*. That ruling, however, has no effect on the in-

terpretation of the present statute since crucial wording in the two statutes is different. The statute at issue in *Seltenreich* required that the lease of property "held for any public use" be ratified by the voters but that new industry sites "shall not be deemed to be 'property . . . held for any public use . . . .' " 20th Subsec., § 16–1–35, ACLA 1949. That statute clearly included an explicit exemption for new industry sites from the ratification requirement and is therefore distinguishable from the current statute. The statutory construction of the *Seltenreich* court, for that reason, provides no guidance in the case at bar.

The other case involving AS 29.48.260 is *Wright v. City of Palmer*, 468 P.2d 326 (Alaska 1970), in which we cited AS 29.10.132(e), a predecessor to the present statute. 468 P.2d at 329. In *Wright*, however, we cited the statute in dictum merely as authority for a city's power to lease industrial sites which benefit the municipality. *Wright* involved no question relating to the procedure to be followed in leasing such property and therefore provides no assistance on that issue.

trol, use and dispose of" property, but such action by the municipality must be "for a purpose authorized under . . . law . . . ."[20] AS 29.48.030 sets forth some of the approved purposes. It authorizes municipalities to "exercise the powers necessary" to provide certain public facilities and services, and it specifically authorizes a municipality to provide "cold storage plants."[21] AS 29.48.260(e) is another provision which sets forth a *purpose* in pursuit of which municipalities may exercise their *power* under AS 29.48.010 to acquire or dispose of property—namely making "sites available for beneficial new industries."

This specific authorization is important in two respects. First, the general rule is that municipalities may acquire and hold land only for a public purpose. *See* 2A C. Antieau, Municipal Corporation Law §§ 20.00 & 20.10 (1979) (citing "the great weight of authority") (hereinafter Antieau); 10 E. McQuillan, The Law of Municipal Corporations §§ 28.11 & 28.12 (3d ed. F. Ellard 1966) (hereinafter McQuillan). AS 29.48.-260(e), however, authorizes a municipality to acquire land for a private, not a public, purpose, when the purpose is "to make sites available for beneficial new industries."[22] Second, the grant of power is important because municipalities generally must have specific authorization to acquire and hold land outside the territorial limits of the municipality. *See* 1 Antieau §§ 5.10 & 5.11;

2 McQuillan § 10.07. AS 29.48.260(e) provides (emphasis added): "A municipality, in order to make sites available for beneficial new industries, may acquire and hold real property, *either inside or outside the corporate limits* . . . ." This is one of several sections in title 29 which authorize extraterritorial activity of a municipality for specified purposes.[23]

We do not believe that the legislature, in adopting AS 29.48.260(e), intended to create an exception to the procedural requirements of AS 28.48.260(c). AS 29.48.260(c) sets forth the formal procedure that a municipality must establish by ordinance for the "sale, lease or disposition of real property." This section requires an appraisal of the property, public notice, public auction or opening of sealed bids; if the property or interest in the property is worth more than $25,000, the transaction must be ratified by the voters.[24]

Two of the subsections of AS 29.48.260 authorizing particular types of property transactions contain explicit language exempting those transactions from the procedural requirements of subsection (c). Subsection (b), for example, authorizes the municipality to engage in certain transactions "[n]otwithstanding the provisions of (c) of this section." Subsection (d), authorizing land transactions with the state, similarly includes the phrase, "in which event the

---

**20.** AS 29.48.010 provides in pertinent part:
*General powers.* Municipalities have the following general powers, subject to other provisions of law:

. . . . .

(9) to acquire, manage, control, use and dispose of real and personal property for a purpose authorized under this title, federal law, or other law, or in accordance with such law, and irrespective of whether or not the property is situated within or outside the municipal boundaries . . . .

**21.** AS 29.48.030 provides in pertinent part: "(a) A municipality may exercise the powers necessary to provide the following facilities and services: . . . (8) cold storage plants[.]"

**22.** AS 29.48.260 contains three other subsections which set forth *purposes* for which the municipality may engage in property transactions: AS 29.48.260(a) ("dispose of property no longer required for municipal purposes"); AS

29.48.260(b) (transactions with the United States, the state or political subdivision when "it is advantageous to the municipality to do so"); AS 29.48.260(d) (land transactions with the state). *See* text of AS 29.48.260 in note 5 *supra*.

**23.** *See, e. g.,* AS 29.48.037 (parks, roads, trails, playgrounds, cemeteries, airports); AS 29.48.-040 (utility services for adjacent areas).

**24.** *See* text of AS 29.48.260 in note 5 *supra*. Subsection (e) permits the council to establish "terms and conditions" that are "advantageous to the municipality." This language, however, still has meaning if competitive bids are required. In a sale by bid the council's terms and conditions would merely be set forth in the bid specifications rather than developed in negotiations.

provisions of (c) of this section do not apply." On the other hand, subsection (a) contains no language exempting transactions pursuant to that subsection from the requirements of subsection (c). Likewise, subsection (e), which is in question, here, contains no *explicit* exemption. Since the legislature demonstrated its awareness of subsection (c) by explicitly exempting some types of transactions from its requirements, we must conclude that the legislature intended *not* to exempt transactions under subsections (a) and (e) from its requirements.[25] Where the legislature inserted an explicit exemption in some subsections and not in others, it would be inappropriate for us to find an "implied exemption" in a subsection where the legislature obviously chose not to insert an exemption.

Moreover, as pointed out in Justice Rabinowitz' concurring opinion, the statutes which preceded the present AS 29.48.260(e)

specifically exempted from voter ratification requirements those municipal property transactions which sought to establish new beneficial industries in the community. The exemption was achieved by expressly providing that such transactions were not within the category subject to the ratification requirement.[26] These specific exemptions show that the legislature was aware of the arguable need for such transactions to be free from the restraints imposed by the ratification requirement. We conclude that the legislature's failure to include such a specific exemption in the present statute evidences an intent not to exempt transactions under subsection (e) from the requirements imposed by subsection (c).

We base our decision on this construction of the statute despite the apparent willingness of appellants' counsel to concede that AS 29.48.260(e) does create an exception to the competitive bid requirements.[27] It

25. *See* 2A Sutherland § 47.11 (footnotes omitted): "Especially where there is an express exception, it comprises the only limitation on the operation of the statute and no other exceptions will be implied. An enumeration of exceptions from the operation of a statute indicates that it should apply to all cases not specifically enumerated."

26. *See* ch. 27, § 1, SLA 1945 and former AS 29.10.132(e). Chapter 27, § 1, SLA 1945, provided, in part, as follows:

[T]he common council, in order to make available sites for the installation and operation thereon of new industries which will benefit the civic welfare of the municipality, may likewise acquire, own and hold such sites, including real property, either within or without the corporate limits and may sell, lease or dispose thereof upon such terms or conditions as may be deemed advantageous to the civic welfare of the municipality, to such persons, associations, co-partnerships or corporations as will agree to install, maintain and operate thereupon such new industry or industries, and such sites as well as any right, equity, claim or title now or hereafter acquired by the municipality in and to real property sold to it for delinquent taxes, *shall not be deemed to be "property acquired, owned or held for any public use or devoted thereto" as used herein.* [Emphasis added.]

Former AS 29.10.132(e) provides:

The council, in order to make sites available for new industries which will benefit the municipality, may likewise acquire, own and

hold such sites, including real property, either inside or outside the corporate limits and may sell, lease or dispose of them upon the terms and conditions as it considers advantageous to the civic welfare of the city, to persons who will agree to install, maintain and operate a beneficial new industry. Sites acquired under this paragraph and any right, equity, claim or title acquired by the municipality to real property sold to it for delinquent taxes *are not "property acquired, owned or held for or devoted to a public use" as used herein.* [Emphasis added.]

27. The following exchange took place at oral argument before this court:

Counsel for Appellants: I think [subsection (e)] should be given a very narrow reading in light of the fact that it is an exception to the generally favorable policy of having competitiveness and the generally favorable policy of requiring bidding in order to prevent any possibility of favoritism or fraud or corruption.

Justice Boochever: Are you conceding that subsection (e) eliminates those requirements?

Counsel for Appellants: Yes, your honor, I am conceding that, if subsection (e) applies, if it's a new industry, then it eliminates those requirements to the extent that a municipality adopts an ordinance stating what terms and conditions they want to apply. . . .

Justice Boochever: Couldn't it be construed more favorably to you that this is authorizing municipalities to . . . prepare sites and make them available for new industries, but

would be within our power to find that appellants had waived this point by their failure to brief or argue it. *See Fairview Development, Inc. v. City of Fairbanks,* 475 P.2d 35, 36 (Alaska 1970). Competitive bid requirements for the letting of public contracts, however, are intended to protect the public and to insure that the government body in question obtains the most favorable terms possible in its contracts. 1A Antieau § 10.26 (1974); 10 McQuillan § 29.29. Where, as here, the public is the intended beneficiary of a statutory requirement, we do not believe it would be appropriate to recognize a waiver of that requirement. *Cf.* 2A Sutherland § 55.08 ("laws enacted for the protection of third persons should not be permitted to be waived since the third persons interested in the statute are not made parties to the waiver"). We conclude that AS 29.48.260(e) does not establish an exemption from the bid requirements of AS 29.48.260(c), and we therefore reverse the decision of the superior court on this issue.

### IV. What Is the Effect of Dillingham Ordinance No. 22?

■ Since the effect of Dillingham Ordinance No. 22 may be pertinent on remand, we shall briefly address this question. Sections III and IV of Dillingham Ordinance No. 22[28] established essentially the same procedural requirements for municipal land transactions as are established in AS 29.48.-260(c),[29] and we find that these provisions of the ordinance are applicable to the transaction at issue in this case. Section VII of

Ordinance No. 22, however, purported to exempt leases for new industry sites from the ratification requirement of section IV. Such an exemption would conflict directly with the requirements of AS 29.48.260(c), as we have construed it.

Dillingham is a general law municipality, not a home rule municipality.[30] As a general law municipality, it has only those legislative powers conferred by law. AS 29.08.-020. Since section VII of Ordinance No. 22 conflicts directly with the provisions of AS 29.48.260(c), it is invalid.[31] As discussed in 1 Antieau § 5.14 (footnote omitted), "[w]here the mode of exercise of municipal power is prescribed by statute, this is the measure of the municipal power; such mode must be followed, and all other methods are excluded." *See also id.* § 5.35; 2 McQuillan § 10.27.

### V. Instructions on Remand

We remand this case to the superior court for a determination of whether the City complied with the statutory competitive bid requirements. If it did not comply with the bid requirements, the superior court should then decide whether the non-compliance was excused because of emergency or impracticability or any other legally cognizable excuse. On remand the superior court may base its determinations on the existing record if it concludes that the record is adequate. It may, however, take additional documentary evidence or proceed to trial, at its discretion. If the superior court on remand determines that the noncompliance, if

---

it doesn't have anything to do with the [bid] requirements of subsection (c)?

Counsel for Appellants: That certainly is more favorable to my position, your honor. It does, however, . . . provide that the local council can establish terms and conditions . . . . Our position, your honor, is that . . . the City of Dillingham failed to provide any terms and conditions in its ordinance which exempted the sale of such real property for new industries . . . from the bid process and the notice requirements.

**28.** Set forth in note 6 *supra.*

**29.** Set forth in note 5 *supra. See* text accompanying note 24 *supra.*

**30.** *See* Dillingham Municipal Code § 1.04.-030(c). If Dillingham were a home rule city, the requirements of AS 29.48.260 would not be applicable. *See Lien v. City of Ketchikan,* 383 P.2d 721, 723 (Alaska 1963) (AS 29.10.132(a), predecessor of AS 29.48.260(a), not applicable to home rule city).

**31.** Appellee Engstrom Brothers Company contends on appeal that Ordinance No. 22 is invalid in its entirety. We do not address this question, however, since we find no indication in the record that this issue was presented to or ruled on by the superior court. *See Moran v. Holman,* 501 P.2d 769, 770 n.1 (Alaska 1972).

any, was not excused, it may fashion such relief as it deems appropriate.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

RABINOWITZ, Justice, concurring.

I agree with the majority's conclusion that the lease of the Dillingham cold storage facility was subject to the requirements of AS 29.48.260(c), including its competitive bidding requirement. However, I would reach that result by a statutory interpretation different from that employed by the majority.

AS 29.48.260(e) provides:

A municipality, in order to make sites available for beneficial new industries, may acquire and hold real property, either inside or outside the corporate limits, and may sell, lease or dispose of it to persons who agree to operate a beneficial new industry upon the terms and conditions the assembly or council considers advantageous to the municipality.

The majority opinion concludes that real property transactions made by a municipality "in order to make sites available for beneficial new industries" are subject to the procedural, competitive bidding, and voter ratification requirements of AS 28.48.260(c), because subsection (e) of AS 29.48.260, unlike subsections (b) and (d), does not include an express exemption from those requirements. However, I have concluded that the legislature did not intend such transactions to be subject to those requirements. This conclusion is based on general principles of statutory interpretation, a review of previous Alaska statutes authorizing municipalities to acquire real property and make it available to new industries, and the public policies underlying those earlier statutory provisions and the current provisions of AS 29.48.260(e).

First, I think the majority opinion's interpretation of AS 29.48.260(e) is contrary to the fundamental rule of statutory construction which provides that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." [1] As the majority opinion says, under its interpretation the first clause of this statutory provision remains significant, as it authorizes a municipality to acquire real property for the specific purpose of making sites "available for beneficial new industries."

However, the last clause of subsection (e) authorizes a municipality to "sell, lease, or dispose of [property acquired for this purpose] to persons who agree to operate a beneficial new industry *upon the terms and conditions the* [municipal] *assembly or council considers advantageous to the municipality."* As the majority opinion says, under its interpretation this clause would mean only that the council's terms and conditions would be set forth in the bid specifications. The majority's interpretation thus renders this clause superfluous and insignificant, since the general procedural provisions of AS 29.48.260(c), which the majority holding applies to AS 29.48.260(e), also provide that the terms and conditions for competitive bidding are to be fixed by the assembly or council.[2] If the last clause in AS 29.48.260(e) is not to be redundant, it must be read as giving the assembly or council the authority to negotiate and approve a real property transaction with a beneficial new industry.

The earliest Alaska statute authorizing municipalities to engage in real property transactions with beneficial new industries provided that:

[T]he common council, in order to make available sites for the installation and operation thereon of new industries which will benefit the civic welfare of the municipality, may likewise acquire, own

---

1.  2A C. Sands, Sutherland Statutory Construction § 46.06, at 63 (4th ed. 1973). *See, e. g., Isakson v. Rickey,* 550 P.2d 359, 364 (Alaska 1976).

2.  For example, the assembly or council would set the terms and conditions of bid specifications for the disposition of "property no longer required for municipal purposes" under AS 29.48.260(a), though that provision does not explicitly so state.

and hold such sites, including real property, either within or without the corporate limits and *may sell, lease or dispose thereof upon such terms or conditions as may be deemed advantageous to the civic welfare of the municipality*, to such persons, associations, co-partnerships or corporations as will agree to install, maintain and operate thereupon such new industry or industries, and *such sites* as well as any right, equity, claim or title now or hereafter acquired by the municipality in and to real property sold to it for delinquent taxes, *shall not be deemed to be "property acquired, owned or held for any public use or devoted thereto" as used herein.*[3] The statutory scheme at that time had no competitive bidding requirements, but did require voter ratification of any "sale, lease, exchange or other disposition of any property acquired or held for any public use, or devoted thereto."[4] As the majority opinion recognizes, the disposition of new industry sites was thus explicitly exempted from those ratification requirements.[5]

Such transactions were instead to be made by the municipal council "upon such terms or conditions as may be deemed advantageous to the civic welfare of the municipality," an expression of council authority virtually identical to that in AS 29.48.-260(e), the statutory provision involved in the present case. Indeed, the language of that early beneficial new industry provision was retained virtually intact in successive statutes, including the immediate predecessor to the present statute.[6]

As a general principle, "[t]he legal history of a statute, including prior statutes on the same subject, is an especially valuable guide for determining what object an act is supposed to achieve."[7] I think that there were definable public policy considerations which moved previous Alaskan legislatures to exempt from voter ratification requirements a municipal property transaction undertaken by a municipal assembly or council to establish a beneficial new industry in the community. The majority opinion fails to recognize those considerations in construing the present statute to impose not only voter ratification requirements, but also competitive bidding requirements, on such transactions.

Competitive bidding is widely required in municipal contracts for the positive purpose of "inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption."[8] However, as a general rule municipal corporation competitive bidding requirements are construed narrowly, since "[i]n the absence of some statutory provision, competitive bidding is not an essential prerequisite to the validity of contracts by and with public bodies."[9]

3. This paragraph was enacted in ch. 27, § 1, SLA 1945 (emphasis added).

4. *Id.*

5. *See Seltenreich v. Town of Fairbanks*, 103 F.Supp. 319 (D.Alaska 1952), *aff'd*, 211 F.2d 83 (9th Cir.), *cert. denied*, 348 U.S. 887, 75 S.Ct. 206, 99 L.Ed. 697 (1954).

6. The provisions succeeded by the present AS 29.48.260(e) were in former AS 29.10.132(e), which provided:
    The council, in order to make sites available for new industries which will benefit the municipality, may likewise acquire, own and hold such sites, including real property, either inside or outside the corporate limits and may sell, lease or dispose of them upon the terms and conditions as it considers advantageous to the civic welfare of the city, to persons who will agree to install, maintain and operate a beneficial new industry. Sites acquired under this paragraph and any right,

equity, claim or title acquired by the municipality to real property sold to it for delinquent taxes are not "properly acquired, owned or held for or devoted to a public use" as used herein.

7. 2A C. Sands, Sutherland Statutory Construction § 48.03, at 191 (4th ed. 1973).

8. 10 McQuillin, Municipal Corporations § 29.29, at 321 (3d ed. rev. 1966). *See, e. g., Coller v. City of St. Paul*, 223 Minn. 376, 26 N.W.2d 835, 841 (1947).

9. *People ex rel. Adamowski v. Daley*, 22 Ill. App.2d 87, 159 N.E.2d 18, 20 (1959). *See also Hertz Drive-Ur-Self System, Inc. v. Tucson Airport Auth.*, 81 Ariz. 80, 299 P.2d 1071 (1956); *Riverside County v. Whitlock*, 22 Cal.App.3d 863, 99 Cal.Rptr. 710 (1972); *R. E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331 (Minn. 1978); *Thatcher Chem. Co. v. Salt Lake City Corp.*, 21 Utah 2d 355, 445 P.2d 769 (1968).

The reason for this rule of narrow construction is pragmatic; there are contexts in which a requirement of competitive bidding impedes rather than enhances the efficiency of municipal government.

Therefore, even where there are statutory competitive bidding requirements generally applicable to municipal contracts, "[t]he manifest impracticality of demanding strict compliance with a statutory requirement of public bidding under certain circumstances has resulted in widespread recognition of three general exceptions."

The first and most prevalent involves the emergency situation. Thus, the requirement of competitive bidding may be dispensed with where it is essential to the health, safety or welfare of the people that immediate action be taken. The almost infinite variety of factual contexts in which this problem has arisen, though, renders it infeasible to isolate the 'emergencies.' However, in order for the exception to be granted, it is necessary that an emergency 'be present, immediate, and existing, and not a condition which may or may not arise in the future, or one that is . . . to be expected to arise.'

By the weight of authority, a second general exception applies to contracts for the purchase of public utilities. Several jurisdictions apparently still refuse to recognize this exemption. However, the majority have more realistically considered the monopolistic nature of the public utility companies, and the rate controls to which they are subjected, and have thus removed contracts for their services from the statutory requirement.

Third, contracts for the purchase or lease of real estate for municipal use are generally excluded from competitive bidding procedures. Insofar as the particular location is most frequently that which makes land desirable, little purpose could be served in imposing an otherwise applicable statutory requirement. These decisions, then, apparently reflect a continuation of the time-honored deference the courts have paid to the 'uniqueness' of land.[10]

Fact specific exceptions have also been recognized where the contract is for rendering specific professional or skilled services,[11] or for a desired service, product, or process available from only one source,[12] and where a transaction involving municipal real property rights was not amenable to competitive bidding.[13]

See generally 10 McQuillin, Municipal Corporations § 29.31 (3d ed. rev. 1966).

**10.** Note, *The Necessity of Competitive Bidding in Municipal Contracts*, 27 U.Pitt.L.Rev. 117, 120–21 (1965) (footnotes omitted).

The appellees have argued that if competitive bidding requirements do apply to the lease in this case, compliance was unnecessary because of the emergency exception. However, negotiations for the lease were conducted over the course of several years and three bid invitations were in fact issued by the city. *See also* 10 McQuillin, Municipal Corporations § 29.38, at 344 (3d ed. rev. 1966) (emergency exception doesn't apply to "a condition . . . which reasonably may be seen in time to advertise for bids"). Still, I agree with the majority that this is a question which should be addressed by the superior court on remand.

**11.** *See* Note, *supra* note 10, at 118; Annot., 15 A.L.R.3d 733 (1967). *See, e. g., Parker v. Panama City,* 151 So.2d 469 (Fla.App.1963) (tax expert); *Lehigh Const. Co. v. Housing Auth. of City of Orange,* 56 N.J. 447, 267 A.2d 41 (1970) (plans and developers for low-rent housing for

elderly); *Mongiovi v. Doerner,* 24 Or.App. 639, 546 P.2d 1110 (1976) (architectural services); *Commonwealth ex rel. Roberts v. Tice,* 272 Pa. 447, 116 A. 316 (1922) (attorney); *Modjeski & Masters v. Pack,* 215 Tenn. 629, 388 S.W.2d 144 (1965) (consulting engineer).

**12.** *See, e. g., Hylton v. Mayor and City Council of Baltimore,* 268 Md. 266, 300 A.2d 656 (1972) (only one possible source for desired type of waste treatment facility); *Cosentino v. City of Omaha,* 186 Neb. 407, 183 N.W.2d 475, 479 (1971). *See also* Note, *supra* note 10, at 123.

**13.** *See, e. g., Meakin v. Steveland, Inc.,* 68 Cal. App.3d 490, 137 Cal.Rptr. 359, 363 (1977) (sale of small plot of San Francisco to developer for construction of pedestrian plaza; full appraised value paid, only potential use, and only potential purchaser; "where requests for competitive proposals would be futile, unavailing or would not produce an advantage, statutes requiring competitive bidding do not apply"); *Whelan v. N. J. Power & Light Co.,* 45 N.J. 237, 212 A.2d 136 (1965) (contract between city and power company; city to acquire additional

The "public purpose" in encouraging the development of beneficial new industries in Alaskan communities has been recognized by this court in the context of holding municipal industrial development bond schemes constitutionally permissible in *Wright v. City of Palmer*, 468 P.2d 326, 330–31 (Alaska 1970). Courts and legislatures have generally given broad latitude to municipalities to develop incentives to economic development through tax exemptions and municipal bond financing for new industry. *Id.*[14]

In most cases municipalities must negotiate agreements for establishing a new industry in a community on an individual basis with a prospective industry; it is simply unrealistic to require a municipality to issue a general invitation to bid as a means of attracting such potential industrial developers. For that reason, agreements between municipalities and industries for new development, which may include construction of plants financed by municipal bonds, property leasing or sale arrangements, and tax benefits tailored to the specific needs of the industrial developer, have been widely exempted from general competitive bidding requirements.[15]

I think a recognition of the pragmatic necessity of giving municipal governing

water supply, company to use reservoir to generate hydroelectric power as well as purchase five acres of municipal property for hydroelectric plant site; competitive bidding statute should not be read to "deny municipalities authority to deal with problems in a sensible, practical way").

**14.** *See also* Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach*, 111 U.Pa.L. Rev. 265 (1963); Note, *Legal Limits to Public Inducement to Industrial Location*, 59 Colum.L. Rev. 618 (1959); Note, *Industrial Development Bonds: Judicial Construction vs. Plant Construction*, 15 U.Fla.L.Rev. 262 (1962); Note, *Incentives to Industrial Relocation: The Municipal Industrial Bond Plans*, 66 Harv.L.Rev. 898 (1953); Comment, *Financing Industrial Development with Municipal Revenue Bonds*, 1967 U.Ill.L.F. 331 (1967); Note, *The "Public Purpose" of Municipal Financing for Industrial Development*, 70 Yale L.J. 789 (1961).

**15.** *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 131 N.W.2d 5, 24 (1964) (upholding validity of bond statute and city council's proposal to issue bonds to finance construction of specially designed new factory building to be leased to industry without public bidding); *Gregory v. City of Lewisport*, 369 S.W.2d 133, 135 (Ky.App.1963) (competitive bidding not required for construction work on bond-funded aluminum plant); *R. E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331, 342–43 (Minn. 1978) (competitive bidding not required for parking garage contract executed in conjunction with hotel development); *Wring v. City of Jefferson*, 413 S.W.2d 292 (Mo.1967) (competitive bidding not required for bond-funded construction and lease to company); *Whelan v. N. J. Power & Light Co.*, 45 N.J. 237, 212 A.2d 136 (1965) (see note 13 *supra*); *Clem v. City of Yankton*, 83 S.D. 386, 160 N.W.2d 125, 134 (1968) (competitive bidding not required for bond-funded construction, since it is acquired for private industry rather than public use); *Uhls v. State*, 429 P.2d 74 (Wyo.1967) (bond-funded $25,000,000 refinery leased without needing to meet competitive bidding requirements "in the sale of city property"). The rationale was expressed in *Bennett v. City of Mayfield*, 323 S.W.2d 573, 576 (Ky.App.1959) (bond-funded site acquisition and plant construction with lease to tire manufacturer):

There are many special transactions of such character as to make it impractical or unwise to apply the policy of competitive bidding . . . . The commitment of the [City] to sell and convey the property to the lessee according to the option is not an obligation to sell property in the ordinary and usual meaning or such a character of sale as generally requires competitive bids. This commitment is an integral and essential consideration of the whole contract [for the development of a new industry in the community] existing ab initio, and is not a contract arising subsequent to the lease . . . . We, therefore, hold this provision not to be such a contract of alienation or sale of property as requires advertisement and sale on competitive bids. It is also recognized that:

With respect to the power of a city to dispose of its property without advertising for bids, there is a clear distinction between disposing of property purchased and held for public use and the benefit of the citizens and disposing of property acquired and used for strictly corporate or proprietary purposes. As to the latter class of property, the power of a municipality to sell is unquestionable unless restrained by charter or statute. That is the law in general.

*Bennett v. City of Mayfield*, 323 S.W.2d 573, 576 (Ky.App.1959). *See generally* Annot., Power of Municipal Corporations to Lease or Sublet Property Owned or Leased by It, 47 A.L.R.3d 19, 63–67 (1973).

bodies the power and flexibility to negotiate with potential industrial developers moved previous Alaska legislatures to exclude beneficial new industry transactions from the voter ratification requirements of the predecessor versions of the municipal property statutory provisions involved here. It would be inconsistent with this legislatively expressed public policy to interpret the current statutory provisions as imposing both voter ratification and competitive bidding requirements on such transactions. Therefore, I would conclude that the legislature did not intend to impose those requirements in this context, but intended to give municipal assemblies and councils the authority to "sell, lease or dispose [of real property acquired for this purpose] to persons who agree to operate a beneficial new industry upon the terms and conditions the assembly or council considers advantageous to the municipality."

Despite the fact that I disagree with the majority opinion's construction of the "beneficial new industry" provisions of AS 29.-48.260(e), I concur in its disposition of this case because, unlike the majority, I do not think the renewed operation of the Dillingham cold storage facility by Engstrom Brothers is a "beneficial new industry." Given my view of the purpose of these "beneficial new industry" provisions, I think the tax exemption cases employed by the majority are particularly appropriate and can agree that "the term 'beneficial new industry,' as used in AS 29.48.260(e), refers to any newly organized business that is not a mere expansion or continuation of a business that has previously operated in the municipality."

While perhaps there should be some deference to a community's political discretion in determining "beneficial new industry" status,[16] the negotiations here involved a lease of a pre-existing cold storage facility for a renewal of its prior use. The exemption from voter ratification and competitive bidding requirements provided under my view of AS 29.48.260(e) is addressed to a situation where a municipality is attempting to attract a truly new industry and must negotiate based on the specific needs of that potential industrial developer. In contrast, the facts in this case reveal a situation amenable to the bidding and ratification requirements of AS 29.48.260(c). There was at least one other concern willing to compete to lease and operate the cold storage facility, and three bid invitations were in fact issued by the City and apparently received no response only because the City's terms were unduly restrictive.

There is certainly an economic benefit to the Dillingham community from the renewed operation of this facility. However, this would be true in the case of any "expansion or continuation of a business that has operated in the municipality." Neither the fact that a different corporation is to operate the facility nor the fact that the facility had not been operated for one season prior to the beginning of lease negotiations alters my conclusion that the renewed operation of the facility was only a continuation or, at most, a slight expansion of the existing cold storage business and not a "beneficial new industry" in the terms of AS 29.48.260(e).[17]

16. *See, e. g., Meador v. Mac-Smith Garment Co.*, 188 Miss. 98, 191 So. 129, 133 (1939) (recognizing discretion in board to determine "new industry" status). *See also Uhls v. State*, 429 P.2d 74 (Wyo.1967). In *Uhls*, the Wyoming Supreme Court, by a 3–2 decision, upheld a bond financing, construction and lease agreement between the City of Cheyenne and an oil company for a $25,000,000 new refinery. The dissenters argued that "no 'new' industry [was] being brought to Cheyenne" because the agreement was for building a new plant to replace 25-year-old facilities bordering on competitive obsolescence which would employ a maximum of 30 additional employees. *Id.* at 91. While

the dissenters felt this was not a new or even expanded industry, and that there had therefore been no clear showing of public purpose, the majority was content to respect the community's political decision as to the economic desirability of the project.

17. *Meador v. Mac-Smith Garment Co.*, 188 Miss. 98, 191 So. 129, 134 (1939), stated the following simple test, which is helpful in this case:

We think that the test is whether the factory now being operated by the present exemptionist is a new factory compared with that

For this reason, I concur with the majority opinion's conclusion that the lease of this facility by the City of Dillingham was subject to the competitive bidding requirements of AS 29.48.260(c).

**BOOCHEVER, Chief Justice, concurring and dissenting in part.**

For the reasons ably expressed by Justice Rabinowitz, I believe that AS 29.48.260(e) authorizes the municipal assembly to lease property to a beneficial new industry upon terms and conditions the assembly considers advantageous to the municipality, without being subject to the bidding and ratification provisions of AS 29.48.260(c). I also agree that, in view of those liberal leasing provisions, the definition of "new industry" should be more restrictive than "any newly organized business that is not a mere expansion or continuation of a business that has previously operated in the municipality." I believe that the term "new industry" refers to a type of industry not presently operating in the particular locality.[1] When the lease was entered into with Engstrom Brothers for operation of the cold storage in 1977, there had been no cold storage operation in Dillingham since 1972. The major economic benefits to the community apply here in most respects to the same extent as if there had never previously been a cold storage industry in Dillingham. In my opinion, the establishment of a cold storage facility, when none had been operating for five years, qualified as a new industry.

Under AS 29.48.260(e), the municipality was empowered to lease the facility upon the terms and conditions the assembly considered advantageous. The statute uses the words "may acquire" and "may . . . lease" and does not mandate any particular procedure. The City of Dillingham has enacted an ordinance requiring sealed bids and ratification by the voters for leases of property valued at $25,000.00 or more. Section VII of the ordinance exempts leases to new industries from the requirement of ratification by the voters. There is, however, no exemption from the requirement of sealed bids.

I therefore would join the majority in remanding the case to the superior court, but would request that court to determine if the city complied with the sealed bid requirements of its ordinance, and, if not, whether noncompliance was excused.

**MATTHEWS, Justice, concurring and dissenting in part.**

I believe the superior court did not err in concluding that the cold storage facility was a beneficial new industry. I agree with Justice Boochever that the term "new industry" refers to a type of industry. Such a construction tends to eliminate claims of unfair competitive advantage which might otherwise be made.

I also agree with Justice Boochever that section VII of the city ordinance cannot reasonably be read as exempting sales or leases to operators of new industries from the requirements of section III of the ordinance and for this reason I agree that the order of the superior court granting summary judgment to the appellees must be reversed.

I express no opinion on the question whether under AS 29.48.260 a sale or lease of municipal property to a beneficial new industry under subsection (e) must comply with the requirements of subsection (c). This case was presented to the superior

---

which was actually operated by the former owner . . . . .
That case upheld the grant of a "new industry" tax exemption to a new operator of a factory, where the factory had not been used for three years, much new machinery had been installed, and an entirely different product was to be produced.

Even though I have concluded that this case does not involve a new industry in this sense and that this lease was not authorized by AS

29.48.260(e), the City of Dillingham is, as the majority opinion notes, specifically authorized to "exercise the powers necessary to provide . . . cold storage plants" by AS 29.48.-030(8).

1. This definition would not apply when a similar type of industry was temporarily inactive. When, however, a former industry has been abandoned, reestablishment of such an industry constitutes a "new industry."

court and to this court on the premise that the subsections operated independently, that is, if the conditions of subsection (e) were met, subsection (c) did not apply. No suggestion to the contrary was briefed or argued and the point has been waived.[1] If this were a case in which for some unusual reason the rule of waiver should not be imposed, and I think it is not, then at least supplemental briefs should be called for. It is only natural for a judge who has an opinion on a point which is not argued to believe that the research and arguments of the parties cannot change his mind; but this tendency should be resisted, because it is surprisingly often that just that occurs.

1. *University of Alaska v. Simpson Bldg. Supply Co.*, 530 P.2d 1317, 1324 (Alaska 1975); *Sanui-* ta v. Common Laborer's & Hod Carriers, Local 341, 402 P.2d 199 (Alaska 1965).